# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| | ) | CONSOLIDATED |
| IN RE MORROW PARK HOLDING LLC | ) | C.A. No. 2017-0036-PAF |

## MEMORANDUM OPINION

Date Submitted: January 18, 2022
Date Decided: August 1, 2022

Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, Delaware; *Attorneys for Plaintiffs and Counterclaim Defendants Jonathan Holtzman, Village Green Residential Properties, L.L.C., and VGM Clearing, LLC, and Counterclaim Defendant City Club Apartments, LLC.*

Richard P. Rollo, Travis S. Hunter, Angela Lam, Nicole M. Henry, John T. Miraglia, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Alan S. Loewinsohn, Kerry Schonwald, LOEWINSOHN DEARY SIMON RAY LLP, Dallas, Texas; *Attorneys for Defendants and Counterclaim Plaintiffs CCI Historic, Inc., Compatriot Capital Inc., VG ECU Holdings, LLC, Village Green Holding, LLC, and Village Green Management Company, LLC.*

**FIORAVANTI, Vice Chancellor**

This is the latest chapter of a business divorce among real estate developers. One side is referred to as the Holtzman Parties and the other as the Compatriot Parties. To accomplish their separation, the parties established limited liability companies with operating agreements governing the continued operation and subsequent division of their jointly owned assets. One of those assets was the Morrow Park City Apartments in Pittsburgh, Pennsylvania (the "Apartments" or the "Property"). The agreements provided for the development and financing of the Apartments and contemplated that one of the two developers would acquire the Apartments from the other after they had been substantially completed and occupied.

Despite having negotiated detailed agreements governing the process of their divorce, the parties deviated from the deal terms, leading to further complications, subterfuge, and chiseling. In 2016, one of the developers, Village Green Residential Properties, L.L.C. ("VGRP"—one of the Holtzman Parties), sought to exercise its right to acquire the Apartments by purchasing the interests of two of the Compatriot Parties. The parties' contract specified a process for setting the purchase price, but the parties ignored it. Disagreements over the valuation process ensued, culminating in VGRP filing this action. The initial complaint sought specific performance and an injunction to enforce VGRP's purchase right. The court entered an injunction, conditioned on a bond, essentially maintaining the status quo until a final judgment as to the purchase price.

Since then, the disputes multiplied. This litigation has expanded with the addition of new parties, claims, counterclaims, and third-party claims. There has also been related litigation in this court and elsewhere. Most notably, during the course of this action, the Holtzman Parties encouraged a minority investor to file suit in Pennsylvania. That litigation led to a court-ordered sale of the Apartments to the Compatriot Parties. A portion of the sale proceeds from that transaction has been deposited with this court to apportion in this case.

The parties tried this case over several days via Zoom. The court is tasked with deciding several claims and issues, including among others: (1) did either side breach the agreement governing the sale of the entity that owned the Apartments?; (2) did the Compatriot Parties violate the implied covenant of good faith and fair dealing?; (3) did any of the Compatriot Parties violate an agreement providing for its management of properties owned by the Holtzman Parties or their affiliates?; and (4) how should the proceeds from the sale of the Apartments be allocated? The court concludes that both sides failed to comply with the terms of their agreement governing the sale of the Apartments, but the Holtzman Parties have failed to establish damages. The Holtzman parties also lack standing to assert other claims and otherwise failed to establish breaches of their agreements. Thus, the court leaves the parties where they are following the court-ordered sale of the Apartments to the Compatriot Parties. Finally, the court accepts the Compatriot Parties' interpretation

and calculation of the accrual of preferred returns under the parties' agreements, and the proceeds from the sale of the Apartments must be distributed accordingly.

## I.    BACKGROUND

The following recitation reflects the facts as the court finds them after trial.[1]

### A.    The Parties and the Ownership Structure of the Morrow Park City Apartments

The Plaintiffs are Jonathan Holtzman and certain affiliated companies: Plaintiff VGRP and Plaintiff VGM Clearing, LLC ("VGM Clearing"). They, along with Counterclaim Defendant City Club Apartments, Inc. ("CCA"), another Holtzman affiliate, are the "Holtzman Parties."[2]

The Defendants and Counterclaim Plaintiffs consist of CCI Historic, Inc. ("CCI"); VG ECU Holdings, LLC ("VG ECU"); Compatriot Capital, Inc. ("Compatriot"); Village Green Holding, LLC ("Village Green Holding"); and Village Green Management Company, LLC ("Village Green Management" and collectively with CCI, VG ECU, Compatriot, and Village Green Holding, the

---

[1] Documents filed on the docket for this case are cited as "Dkt." followed by their docket number. The trial testimony (Dkt. 642–47) is cited as "Tr."; post-trial oral argument (Dkt. 670) is cited as "Hrg."; deposition testimony is cited as "Dep."; trial exhibits are cited as "JX"; and stipulated facts in the pre-trial order (Dkt. 626) are cited as "PTO," with each followed by the relevant page, paragraph, or exhibit number.

[2] VGRP and VGM Clearing are Michigan limited liability companies, and CCA is a Delaware limited liability company. PTO, III ¶¶ 2, 4, 5.

"Compatriot Parties"). CCI and Compatriot are Delaware corporations;[3] VG ECU, Village Green Holding, and Village Green Management are Delaware limited liability companies.[4]

In 2011, Compatriot acquired a 50% interest in Village Green Holding, a property-holding entity that was previously under the sole control of Holtzman Parties VGM Clearing and VGRP.[5] Previously, Holtzman had used the entities under his control to develop and manage multifamily housing properties. By 2016, the relationship between the parties had deteriorated, and they decided to part ways. To effectuate their separation, Village Green Holding, VGM Clearing, VGRP, CCI, VG ECU, and Holtzman entered into a "Redemption Agreement," dated February 1, 2016, which contemplated a series of transactions adjusting the parties' interests in their various joint projects.[6] Among those contemplated transactions was a plan to create two "New Companies" to control two then-unfinished properties: Morrow Park City Apartments and Southside Works City Apartments.[7]

---

[3] *Id.* ¶¶ 6, 7.

[4] *Id.* ¶¶ 8–10.

[5] JX 71 § 3.3(a)(i) & Schedule A.

[6] *See* JX 109 ("Redemption Agreement").

[7] *Id.* § 1.1(a)(iv); *see also id.*, Schedule D.

4

The Apartments were wholly owned through Morrow Park City Apartments, LLC ("MP Operating").[8] VG Morrow Park Capital LLC ("MP Managing") held a majority interest in MP Operating.[9] Non-party L.A.V. Associates, LP ("LAV") held a minority stake in MP Operating as well.[10] The owners of LAV previously owned the land underlying the Apartments, and they contributed this land to the project in exchange for an equity stake in MP Operating.[11] The parties to the Redemption Agreement eventually assigned the whole interest in MP Managing to the "New Company," Morrow Park Holding, LLC ("MP Holding").[12]

The following chart reflects the chain of entities that controlled the Apartments as of January 2017:

---

[8] PTO, III ¶ 1.

[9] *Id.*

[10] *Id.*

[11] Tr. 807:2–4 (Greenberg); *id.* at 1190:2–3 (Van Kirk). Specifically, the owners of LAV contributed three parcels of land valued at $4 million. JX 507 at 25; Tr. 1190:2–3 (Van Kirk).

[12] PTO, III ¶ 1; *see* Redemption Agreement § 1.6 & Schedule D.



## B. The Relevant Agreements

This dispute centers on the parties' respective contractual rights and obligations under the limited liability company agreements of MP Holding (the "MP Holding Operating Agreement"), MP Managing (the "MP Managing Operating Agreement"), and agreements that were later executed in connection with those two agreements. The relevant provisions from each agreement are expounded upon below.

### 1. The MP Holding Operating Agreement

Under the Redemption Agreement, CCI and Holtzman initially agreed to be co-managing members with mutual decision rights for the Apartments.[13] Holtzman would later be provided with the opportunity to purchase CCI's interest in the Property, upon the Apartments being "substantially completed" and attaining at least a 93% occupancy rate for at least 45 days, otherwise known as "Stabilization" (the "VGRP Purchase Right").[14] This was later reiterated in the MP Holding Operating Agreement, dated May 31, 2016:

> VGRP Purchase Right. From and after the date of this Agreement and upon the occurrence of Stabilization with respect to the apartment project owned and operated by [MP Operating], VGRP shall have the first right to purchase from CCI and Compatriot, as applicable, and such Persons shall have the obligation to sell to VGRP, the entirety of both of (i) CCI's Membership Interests in the Company and (ii) Compatriot's membership interest in [MP Managing] on the terms hereinafter provided in this Section 10.10. For purposes of this Agreement, "Stabilization" shall be defined as (x) [the Apartments] having been substantially completed (subject only to punch list items that do not directly limit occupancy of units) and (y) such apartments having been at least 93% leased and occupied for at least 45 days. The property manager of such apartments, designated as such by the Co-Managing Members, shall send prompt written notice to the Members at such time as Stabilization shall have occurred with respect to [the Apartments] (the "Notice of Stabilization"). VGRP must notify CCI in writing not later than 60 days after its receipt of the Notice of

---

[13] Redemption Agreement § 1.1(a)(iv)(1).

[14] *Id.* § 1.1(a)(iv)(2); JX 131 ("MP Holding Operating Agreement") § 10.10(a).

Stabilization whether or not it intends to exercise its purchase rights under this Section 10.10(a).[15]

The agreement provides CCI with a similar, secondary right to purchase VGRP's interest in MP Holding in the event that "VGRP determines not to so exercise such purchase rights, or it fails to timely provide the written notice referenced in Section 10.10(a)" (the "CCI Purchase Right").[16] The possible exercise of the VGRP Purchase Right or the CCI Purchase Right is sometimes referred to herein as a "Section 10.10 Transaction."

The MP Holding Operating Agreement also provides that upon either party's exercise of its respective purchase right, the purchaser shall pay an amount based on an "Appraised Value" of the Apartments.[17] Schedule C to the agreement dictates the process the parties must use to determine the Appraised Value (the "Appraisal Schedule"). If they cannot reach an agreement as to the Appraised Value within 15 days of either party's exercise of its respective purchase right, the parties are required to follow a three-appraiser process to determine the Appraised Value. The required framework, in pertinent part, is as follows:

---

[15] MP Holding Operating Agreement § 10.10(a).

[16] *Id.* § 10.10(c).

[17] *Id.* §§ 10.10(b), (d).

1. . . . If the Parties are unable to reach an agreement [on the Appraised Value] within [15 days], then CCI shall designate an appraiser for the purpose of establishing the Appraised Value of [the Apartments], and shall give notice thereof in writing to VGRP ("Notification"). Within ten (10) days after CCI gives the Notification, VGRP shall designate a second appraiser for establishing the Appraised Value of [the Apartments], and shall give notice thereof in writing to CCI. If VGRP shall fail to timely appoint an appraiser, the appraiser appointed by CCI shall select the second appraiser within ten (10) days after VGRP['s] failure to appoint.

2. The two appraisers so appointed shall appoint a mutually agreed third appraiser within ten (10) days following the selection of the second appraiser. If the two appraisers so appointed shall not be able to agree on the selection of a third appraiser within ten (10) days after the two initial appraisers have been appointed, then either appraiser, on behalf of both, may request such appointment by the head of the local chapter of the Appraisal Institute. The appraisers shall specialize in the appraisal of real estate projects similar to [the Apartments] in the region where [the Apartments] are located, shall have no less than five years' experience in such field and shall be recognized as ethical and reputable. No appraiser shall have any personal or financial interest as would disqualify such appraiser from exercising an independent and impartial judgment as to the value of [the Apartments]. The Appraised Value of [the Apartments] shall be equal to the average of the valuations of [the Apartments] as determined by the appraisers; provided, however, that if any appraiser's valuation for [the Apartments] deviates by more than ten percent (10%) from the average of the valuation of the other two appraisers for [the Apartments], the Appraised Value shall be determined by using the average of the other two appraisers' valuations. . . . The appraisals shall be submitted to CCI and VGRP within thirty (30) days after the panel of three (3) appraisers is constituted. The decision of the appraisers shall be binding on the Members.[18]

---

[18] *Id.*, Schedule C.

### 2. The MP Managing Operating Agreement and the Business Plan

In general, the parties financed a project's construction with a construction loan, and when the project was complete, they would convert that loan to "permanent" financing and secure a permanent mortgage loan.[19]  The parties contemplated that structure for the Apartments, which is also reflected in the agreements governing the parties' separation.  The MP Managing Operating Agreement references a "Business Plan," which is appended to the agreement as an exhibit:

> The Manager, in connection with the Development Company, has prepared a business plan attached as Exhibit B hereto (the "<u>Business Plan</u>"), which has been approved by Compatriot and incorporates (i) an acquisition and initial construction and development budget for costs related to the acquisition, design, development, and lease-up of the [Apartments] ("<u>Development Budget</u>"), and (ii) a site plan for the [Apartments].  Any material changes or deviations from the Business Plan must be approved by Compatriot.[20]

The Business Plan comprises numerous sections containing tables with financial and operational data regarding the Apartments.  The sections are titled, "General and Operating Assumptions," "Development Timing and Cost Assumptions," "Equity and Debt Capitalization," "Equity Pricing/Projected Returns," and "Village Green

---

[19] Tr. 15:15–17:6 (Holtzman); JX 18 at 2–3.

[20] JX 62 ("MP Managing Operating Agreement") § 2.8(c).

Morrow Park City Apartments Development Budget."[21]  Of importance to this dispute is the Equity and Debt Capitalization section and its accompanying table titled, "Permanent Mortgage Upon Stabilization":

| PERMANENT MORTGAGE UPON STABILIZATION | | | |
|---|---|---|---|
| Permanent Loan Date | 3 (mths after Final CO) | | Jan 1, 2016 |
| Stabilized NOI (NOI after RR) | | | $3,239,456 |
| Value (Before Tax Abatement) | 6.00% cap rate | | $53,990,931 |
| Plus: NPV of Tax Abatements | | | $3,689,378 |
| NET STABILIZED VALUE | | | $57,680,309 |
| Per Unit Value @ Stabilization | | | $270,800 |
| | | | |
| TOTAL LOAN AMOUNT | 80.00% LTV | | $46,144,247 |
| Less: Loan Fee/Costs (% of Permanent Loan Amount) | | 0.75% | ($346,082) |
| Less: Construction Loan Payoff | | | ($36,143,000) |
| Less: Amount needed to bring JV Equity Pref Current | | | ($1,554,781) |
| Plus: Rebates/Cable Fees/Grants | | | $92,655 |
| RETURN OF EQUITY FROM PERM LOAN | | | $8,193,040 |
| | | | |
| Interest Only Period (Mths) | | | 24 |
| Amortization (After I/O) (Yrs) | | | 30 |
| Fixed Interest Rate | | | 5.00% |
| Fully Amortizing Debt Service Coverage Ratio | | | 1.21 |

The MP Managing Operating Agreement also imposes limitations on the manager of MP Managing's authority.  Specifically, the manager may not make "Major Decisions," including those relating to modifying the Business Plan or taking out certain loans, absent Compatriots prior written consent:

> Limitations on Authority of Manager:  Notwithstanding anything to the contrary contained in this Agreement (other than as expressly permitted in this Section 6.2), without the prior written approval of Compatriot, the Manager shall not have the power to do any of the following either directly or on behalf of the Project Owner (each, a "Major Decision"):

---

[21] *Id.*, Ex. B.

(a)  Adopt, amend or modify all or any portion of the Business Plan or Annual Plan, or vary from the limitations set forth therein; provided, however, the Manager may make adjustments to individual cost and expense line items set forth on the Operating Budget without the approval of Compatriot [subject to additional limitations];

. . .

(e) . . . subject all or any portion of the Company's or Project Owner's property (including, without limitation, the [Apartments]) to any mortgage, lien, or other encumbrance or pledge any Company or Project Owner assets; provided, pursuant to the Business Plan, the Members have approved a permanent mortgage for the [Apartments], on market terms and conditions from an institutional lender, subject to the following factors:  (1) an amount up to 80% loan to value (which value shall be ascertained at the time the permanent mortgage is being applied for); (2) non-recourse, with no guaranties by any party other than customary non-recourse carve-out guaranty by the Borrower or Village Green, (3) have a minimum term of 7 years, (4) amortization of not less than 25 years, (5) debt service coverage ratio of not less than 1.2 (with amortization), and (6) not more than 2 years interest-only payments.[22]

### 3.     The Preferred Returns

The MP Holding Operating Agreement and the MP Managing Operating Agreement each provided for a preferred return that would accrue for the benefit of certain members (the "Preferred Returns").[23]

Under the MP Holding Operating Agreement, each member holding Class B Preferred Units was entitled to a 10% annual preferred return compounded quarterly

---

[22] *Id.* § 6.2.

[23] MP Operating's operating agreement also provided that its members were entitled to a 9% preferred return.  JX 63 §§ 9.2(f), 9.3.  The parties' dispute does not concern any distributions tied to this preferred return.

on the difference between its capital contributions and any distributions it may have received.[24] VGRP and CCI each owned half of MP Holdings' Class B Preferred Units.[25] The proceeds from a sale of the Apartments were to be distributed to MP Holding's members in the following order of priority: (1) members who had outstanding loans to the company to the extent of their loans, (2) members who had accrued an outstanding preferred return to the extent it had accrued, (3) members owning Class B Preferred Units to the extent of their unreturned capital contributions, and (4) to all members in proportion to the number of Common Units held.[26]

Under the MP Managing Operating Agreement, each member was furnished with a Contribution Account.[27] The Contribution Account accounted for the difference between a member's capital contributions and the distributions they had received from a Capital Transaction e.g., a sale of the Apartments.[28] MP Managing also maintained a Contribution Cumulative Preference Account and Contribution Current Preference Account for each of its members. A member's Contribution Current Preference Account balance was calculated as the sum of the balances of

---

[24] MP Holding Operating Agreement § 13.1, "Unpaid Class B Preferred Return."

[25] *Id.*, Schedule A.

[26] *Id.* § 4.3(d).

[27] MP Managing Operating Agreement, art. XIV, "Contribution Account."

[28] *Id.*, "Contribution Account"; *id.*, "Capital Transaction."

their respective Contribution Account and Contribution Cumulative Preference Account.[29]  Any funds credited to a member's Contribution Current Preference Account were subject to a 13% preferred return compounded annually.[30]  Any balance remaining in a member's Contribution Current Preference Account at the end of the fiscal year was subsequently credited to the member's Contribution Cumulative Preference Account.[31]  The proceeds from a sale of the Apartments were to be distributed to MP Managing's members in the following order of priority:  (1) Compatriot, in an amount equal to the credit balance of its Contribution Current Preference Account; (2) Compatriot, in an amount equal to the credit balance of its Contribution Cumulative Preference Account; (3) Village Green Holding, in an amount equal to the credit balance of its Contribution Current Preference Account; (4) Village Green Holding, in an amount equal to the credit balance of its Contribution Cumulative Preference Account; (5) to the members, in an amount equal to the sum of the credit balances of their respective Contribution Accounts, in the ratio that the credit balance of each member's Contribution Account held to the sum of the credit balances of all members' Contribution Accounts; (6) to the

---

[29] MP Managing Operating Agreement, art. XIV, "Contribution Current Preference Account."

[30] *Id.*; *id.*, amend. I § 4.

[31] MP Managing Operating Agreement, art. XIV, "Contribution Cumulative Preference Account."

members, in accordance with their respective percentage interests.[32]  As of May 31, 2016, the last modification to the MP Managing Operating Agreement, Village Green Holding held a 61.58% interest and 15.2% capital interest valued at $1,243,251.85 in the aggregate, while Compatriot held a 38.42% interest and 84.8% capital interest valued at $6,937,887.41 in the aggregate.[33]

### 4.     The Closing Agreement and Redemption Agreement

The Redemption Agreement called for a closing date no later than March 31, 2016.[34]  After failing to close by that date, however, the parties to the Redemption Agreement agreed to twice extend that agreement's closing date, eventually setting it for May 27, 2016.[35]  But the parties again failed to close on the Redemption Agreement by the extended closing date.[36]  On June 3, Village Green Holding, Holtzman, VGM Clearing, VGRP, and CCI entered into a Closing Agreement (the "Closing Agreement").[37]  The Closing Agreement stipulated that the Redemption Agreement's closing was effective as of May 31.[38]  Additionally, the Closing

---

[32] *Id.*, amend. I § 5.2.

[33] *Id.*, amend. II, fifth Whereas clause.

[34] Redemption Agreement § 2.1.

[35] Tr. 56:9–57:9 (Holtzman); *id.* at 1321:10–19 (Van Kirk); JX 894.

[36] Tr. 57:24–58:2 (Holtzman); *id.* at 1323:5–1324:1 (Van Kirk).

[37] *See* JX 136 ("Closing Agreement"); *see also* PTO, III ¶ 17.

[38] Closing Agreement ¶¶ 1, 12.

Agreement contained a provision regarding how Village Green Holding was to continue managing properties that Holtzman controlled (the "Holtzman-Controlled Properties") following the severance of the Holtzman Parties' interests from those of the Compatriot Parties:

> [Village Green Holding] (including all subsidiaries . . . ) and [Holtzman, VGRP, and VGM Clearing] (including . . . CCA properties) will commit to honor the terms of existing management agreements. No services will be performed and no fees will be incurred or charged other than as pursuant to written agreements and fee schedules attached thereto (and/or schedules as may be mutually agreed upon) and pursuant to written authorizations and procedures as set forth in the management agreements. [Village Green Holding] subsidiaries personnel will treat [Holtzman] and his controlled entities in the same manner as [Village Green Holding] subsidiaries treat all other third party clients.[39]

The Redemption Agreement also contained provisions governing the management of Holtzman-Controlled Properties following the separation of the Compatriot Parties' interests from those of the Holtzman Parties. Under the Redemption Agreement:

> The Parties agree that [Village Green Holding and its subsidiaries] currently manage and/or provide other services . . . to . . . certain real estate entities owned or controlled by [Holtzman] [("Holtzman-Controlled Properties")]. . . . Following the Closing and subject to the remaining provisions of this Section . . . , the Parties agree that the [Village Green Holding and its subsidiaries] shall continue to provide such services pursuant to the terms of the existing written property management agreements . . . . The Parties also agree that all such agreements are (and shall remain) terminable by either the [Village

---

[39] *Id.* ¶ 2.

16

Green Holding and its subsidiaries] or [Holtzman] and/or [VGM Clearing and VGRP], as applicable, without payment or penalty upon 60 days prior written notice to the other party or parties to such agreement, with or without cause, provided that the Parties agree, during the 180-day period following the Closing Date with respect to the [Holtzman-Controlled Properties] . . . , such agreements shall remain in effect and shall not be terminated without cause, and shall continue to be staffed by substantially the same [Village Green Holding and its subsidiaries'] personnel (subject to the right of the [Village Green Holding and its subsidiaries] to request the consent of [Holtzman] and/or [VGM Clearing and VGRP] to the modification of such staffing arrangements, which consent shall not be unreasonably be withheld, conditioned or delayed).[40]

## C.    The Parties Begin to Negotiate an Appraisal of the Apartments

After executing the MP Holding Operating Agreement, the parties began to arrange for a potential Section 10.10 Transaction. In September 2016, the parties discussed the possibility of Holtzman purchasing the Apartments through exercise of the VGRP Purchase Right, leading to the purchase of CCI's membership interest in MP Holding and Compatriot's interest in MP Managing. Rather than follow the terms of their agreements, the parties chose to deviate from the three-appraisal process that they had documented in the Appraisal Schedule.[41] One suggested departure was to establish the purchase price using only the appraisal that would be

---

[40] Redemption Agreement § 1.3(a).

[41] *See, e.g.*, JX 193.

submitted in connection with obtaining the permanent financing mortgage for the Apartments (the "Mortgage Appraisal").[42]

On September 23, Village Green Management notified Holtzman and VGRP that the Apartments had reached Stabilization and that VGRP had until November 22 to inform CCI whether it intended to exercise the VGRP Purchase Right.[43] By the end of September, both sides could not agree as to how a modified appraisal process would operate.[44] Therefore, each side communicated that absent an expeditious resolution, the parties should follow "the already-agreed upon process" in the Appraisal Schedule.[45] But days later, on October 5, Jonathan Borenstein, counsel for the Holtzman Parties, emailed Mark van Kirk and Jason Koehn from Compatriot asking if the parties could use "the mortgage appraisal as the third" appraiser.[46] Compatriot did not respond to Borenstein's email.

Both the Holtzman Parties and the Compatriot Parties sought to secure Brian Flanagan of Property Valuation Advisors, Inc. ("Property Valuation Advisors") as their appraiser in the appraisal process. Flanagan and his firm had previously been

---

[42] *See* JX 188; Tr. 74:6–75:2 (Holtzman); JX 121 (arranging a tour of the Apartments for the Freddie Mac loan officers); *see also* JX 41 (HFF engagement letter).

[43] JX 196.

[44] *See* JX 205.

[45] *Id.*

[46] JX 209.

engaged to conduct appraisals on 27 separate occasions for the Village Green entities, most of which occurred under Compatriot's ownership.[47] On October 10, 2016, Jason Koehn, President of Albion Residential, a CCI entity,[48] emailed Flanagan, requesting that he and his team serve as the Compatriot Parties' appraiser.[49] Flanagan declined Koehn's offer the next day, explaining that Holtzman had already requested his services.[50] Flanagan acknowledged that he had been placed in an "awkward position."[51] He told Koehn, via email, that "both you and [Holtzman] have been loyal people to me. . . . My motto is fair is fair and there will be no bias involved. I really appreciate the business opportunities that Village Green has provided to me over the years and hope that I can continue this relationship."[52] Koehn responded asking if Flanagan could provide him with the dates on which Holtzman offered and he accepted the appraiser position.[53]

---

[47] Tr. 650:5–9 (Flanagan); *see, e.g.*, JX 25 (Village Green of Ann Arbor 2012 appraisal); JX 35 (Village Green of Southgate West 2013 appraisal); JX 75 (Village Green Wyandotte 2014 appraisal); *see also* Tr. 487:18–20 (Platt) ("Village Green had utilized Brian Flanagan on a multitude of occasions to complete appraisals for prior projects.").

[48] Tr. 1471:22–1472:7 (Koehn).

[49] JX 224.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

The Compatriot Parties were none too pleased that Holtzman had gotten the jump on them by retaining Flanagan. When Koehn forwarded Flanagan's response to Mark Van Kirk, then-Senior Vice President and General Counsel of Compatriot, Van Kirk responded, "[d]amn. Can you think of any others [appraisers]?"[54] Van Kirk also broke the news to Paul Rowsey, Compatriot's then-President and Chief Executive Officer, informing him that "Holtzman already hired the appraiser we wanted for" the Apartments and that Koehn "was a little worried that this might happen."[55]

After considering three alternative appraisers,[56] Compatriot eventually selected Todd Albert of Colliers International Valuation & Advisory Services, LLC ("Colliers") as its appraiser. On October 19, 2016, Van Kirk informed Holtzman, Borenstein, and Robert Platt, Chief Investment Officer of CCA, of Compatriot's decision, pursuant to the MP Holding Operating Agreement.[57] In response, Platt stated that VGRP had selected Flanagan as its appraiser.[58] Platt continued: "As discussed, we have proposed using the mortgage loan appraisal for the third appraisal, in lieu of having these two appraisers select a third. If you do not wish to

---

[54] JX 227.

[55] JX 223.

[56] *See* JX 229.

[57] JX 237.

[58] *Id.*

pursue that, then both designated appraisers must be instructed to begin working on the appointment of the third appraiser."[59] Van Kirk replied: "Using the mortgage loan appraisal is ok with us."[60] He added: "I looked up Property Valuation Advisors on the internet and it appears that they are a small company based in Chicago, if my research is correct. Would you please confirm with them that they have appraised multifamily in Pittsburgh and give us examples of same?"[61] Platt then followed up with Flanagan: "we need to confirm (part of our agreement with [Compatriot]) that either you or your affiliates have completed appraisals in Pittsburgh and/or that Pittsburgh is one of the cities in which your firm specializes in. Do you have some history here?"[62] Flanagan responded shortly thereafter on October 19:

> I work in [Pennsylvania] and eastern [Ohio] on a recurring basis and most major Midwestern cities. I'm very familiar with Pittsburgh as I grew up about thirty minutes outside of Pittsburgh. I just appraised a similar apartment complex in Cleveland called The Vue that has similar attributes when compared to [the Apartments].[63]

Later that day, Platt emailed Compatriot: "We specifically asked Property Valuation Advisors about their experience in Pittsburgh and they 'work in [Pennsylvania] and

---

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] JX 230.

[63] *Id.*

eastern [Ohio] on a recurring basis and most major Midwestern cities.'"[64] Compatriot did not respond to Platt's email.

### D.    The Appraisal Negotiations Break Down

Both Flanagan and Albert began working on their appraisals following VGRP and Compatriot's October 19 correspondence. On November 8, 2016, Holliday Fenoglio Fowler, L.P. ("HFF"), the mortgage broker that the Holtzman and Compatriot Parties had selected, requested a quote from Albert for an appraisal of the Apartments.[65] Later that day, Clay Cassidy, a Colliers employee who had been assisting Albert with the Colliers appraisal, informed Albert that a draft of the appraisal was ready to be reviewed.[66] Albert responded that he would review the appraisal, but also added, "HFF just asked me to bid on this for lending purposes so there might be some easy $$$ coming your way."[67] On November 9, Nick Matt, a Senior Managing Director at HFF, spoke with Platt about engaging Colliers. In an email to two other HFF employees after the call, Matt recounted: "I asked about Colliers and Compatriot. He [Platt] said that he hasn't spoken with Compatriot, but

---

[64] JX 237.

[65] JX 255.

[66] JX 254.

[67] *Id.*

22

he thinks we should engage Colliers."[68]  Later that day, HFF engaged Colliers for the Mortgage Appraisal.[69]

On November 14, 2016, Albert emailed Koehn, explaining that Colliers was "updating our appraisal for HFF/Lending" and asked for Koehn's "permission to use the same property information that you previously provided us when appraising for Compatriot."[70]  Koehn provided Compatriot's approval later that day.[71]

On Friday, November 18, 2016, Holtzman notified the Compatriot Parties that VGRP intended to exercise the VGRP Purchase Right, with a closing date no later than January 23, 2017.[72]  That same day, Van Kirk acknowledged receipt of the notification, noting that while Compatriot had recently received its appraisal from Colliers, the appraiser had subsequently retracted the appraisal after "omitt[ing] to properly consider some information" and would thus be issuing an update the following week.[73]  Van Kirk suggested that the parties "should all plan on revealing the 3 appraisers' values" the following week.[74]  Also on November 18, Holtzman

---

[68] JX 256.

[69] *See id.*

[70] JX 261.

[71] *Id.*

[72] JX 277.

[73] *Id.*

[74] *Id.*

responded with a different understanding of where the appraisal process stood, writing: "We should follow the signed documents. We do not have 3 appraisals. . . . There have not been any changes to our documents. Please do not represent that there have been.[75] Later that day, Van Kirk responded that "[w]e are following the documents. The documents require three appraisals. I am not representing that there have been any changes to the documents."[76]

The following week, Van Kirk followed up on the status of the appraisals. On November 23, 2016, Van Kirk emailed the Holtzman side, stating that the three appraisals were due within 30 days of the parties selecting their appraisers on October 19.[77] Van Kirk then asked for the status of VGRP's appraisal and the Mortgage Appraisal: "I previously informed everyone that CCI had gotten its appraisal over a week ago but we still don't have the appraisal from Holtzman's appointed appraiser nor from the third appraiser which we agreed would be by the mortgage loan appraiser."[78] Later that day, Borenstein responded, "[s]imilar to your appraiser, our appraiser had discovered discrepancies to be addressed. . . . We were told that they [the appraiser] hope to have it today. . . . When we have it you'll be

---

[75] *Id.*

[76] *Id.*

[77] JX 281.

[78] *Id.*

the first to know."[79]   That evening, VGRP and Compatriot exchanged their respective appraisals.  Flanagan's appraisal for VGRP valued the Apartments at $54.6 million.[80]  Albert's appraisal for Compatriot came in at $59 million.[81]  While they waited for the third appraisal, Compatriot's employees attempted to predict the third appraisal's valuation among themselves.  Later, on November 23, Rowsey wrote, "[d]o we have our updated appraisal?  We were at $59M before any update," referring to the third appraisal.[82]  After Van Kirk confirmed that there had not yet been an update, Rowsey wrote:  "Ok.  So we should be around $57.5M," to which Van Kirk responded:  "Yes.  Unless Holtzman craw fishes on that deal re 3rd appraiser.  But if he does, we can win that battle."[83]  Albert's Mortgage Appraisal was dated November 29 and valued the Apartments at $59 million.[84]  The average of the appraisals conducted for VGRP, Compatriot, and Freddie Mac was thus approximately $57.5 million.

---

[79] *Id.*

[80] PTO, III ¶ 25; JX 248 (Flanagan's appraisal).

[81] PTO, III ¶ 24; JX 257 (Albert's appraisal for Compatriot).

[82] JX 282.

[83] *Id.*

[84] JX 290.

On December 1, 2016, Borenstein emailed Van Kirk asking if the parties could "wrap up today."[85] Van Kirk responded, explaining that he was "tied up on other matters" and Compatriot was "still evaluating the appraisal and appraiser that produced [Holtzman's] appraisal."[86] On December 5, Borenstein followed up, stressing that the parties needed to "keep this on track" and that "[t]he two appraisers should be instructed to immediately select a third appraiser, per the [Appraisal

---

[85] JX 315. The Holtzman and Compatriot parties jointly provided the court with this exhibit before trial. The Compatriot Parties also entered an identical exhibit into evidence as JX 314. The Compatriot Parties cited to JX 315 four times in their pre-trial brief, *see* Dkt. 608 at 20–22, 44 n.37, and three times in their post-trial opening brief, *see* Dkt. 657 ("Compatriot Op. Br.") at 14–15. In their post-trial answering brief, the Holtzman Parties cite to JX 315 for the proposition that "Holtzman was willing to close at the average of the three appraisals before this case began." Dkt. 660 ("Holtzman Ans. Br.") at 22–23. The Compatriot Parties have objected to the Holtzman Parties' use of this exhibit in this instance under Delaware Rule of Evidence 408, which generally bars the admission of compromise offers and negotiations, because this communication was part of the parties' settlement negotiations. DEL. R. EVID. 408. But in their pre-trial brief, the Compatriot Parties cite part of those same settlement negotiations to argue that Borenstein "did not contest an agreement existed to use the mortgage loan appraisal as the third appraisal. Instead, he claimed that VGRP should not be bound by that agreement." Dkt. 608 at 22. Before trial, the Holtzman Parties argued that, rather than attempting to renege on the prior agreement, they disputed what the terms of that agreement were. *See* Dkt. 609 at 27 (arguing that "there were never three 'appraisers' as required by the Stabilization Procedures. There were only three 'appraisals.'"). The Compatriot Parties have already used this same exhibit to refute the position that Borenstein (and by extension the Holtzman Parties) took regarding the appraisal process and have thus waived their present objection by previously relying on this exhibit themselves. *Cf. In re Shawe & Elting LLC*, 2015 WL 4874733, at *28 n.294 (Del. Ch. Aug. 13, 2015) ("Although Shawe objected before trial to the admission of this document under Rule 408 of the Delaware Rules of Evidence, he cited and relied on this document in his opening post-trial brief. . . . Thus, this objection is waived."), *aff'd*, 157 A.3d 152 (Del. 2017).

[86] JX 315.

26

Schedule]."[87] Alternatively, Borenstein offered that if Compatriot preferred, it could "make an offer (in writing) and we will respond."[88] The next day, Van Kirk responded, questioning of Flanagan's qualifications:

> Compatriot is convinced that we have only two good appraisals for [the Apartments], ours and the one for the lender, both at $59M. Holtzman's appraisal does not meet the standards set forth in [the Appraisal Schedule] of the [MP Holding Operating Agreement] because it was not by an appraiser who "specializes(s) [*sic*] in the appraisal of real estate projects similar to the [Apartments] in the region where the [Apartments] are located." When Rob Platt first named Holtzman's appraiser, I questioned him in writing about this and he assure [*sic*] me in writing that the appraiser met this standard. But when we received the appraisal . . . we found that on its face the appraisal states that the appraiser has a temporary practice permit in [Pennsylvania]. One of the conditions to qualify for a temporary practice permit in [Pennsylvania] is that the appraiser cannot have done more than 2 other appraisals in [Pennsylvania] in the last 12 months. Thus, at most, this is only the third [Pennsylvania] appraisal this guy has done in 12 months, and possibly fewer than that. That's not "specializing" in the Pittsburgh region.[89]

Van Kirk also questioned the validity of Flanagan's Pennsylvania temporary practice permit and Flanagan's appraisal methodology, describing the appraisal as "flawed."[90] Van Kirk then argued that after "reform[ing]" Flanagan's appraisal to value the Apartments at $57.725 million, the average value of the three appraisals

---

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *Id.*

was $58.575 million.[91]  Van Kirk stated that Holtzman had 48 hours to either buy the Apartments for $58,575,000, permit Compatriot to purchase the Apartments at this price, or let the offers expire.[92]

On December 8, 2016, Borenstein responded by taking issue with Van Kirk's dismissal of Flanagan's qualifications and his appraisal.  Borenstein contended that Flanagan was "not some shill" and reminded Van Kirk that Flanagan had performed appraisals for properties jointly owned by VGRP and Compatriot and that Van Kirk's team had initially attempted to engage his services for Compatriot's appraisal.[93]  Borenstein then questioned the validity of the other two appraisals:

> When we proposed the idea of using the loan appraisal for the third appraiser, we were unaware that the lender would be using the same appraiser.  As it turns out, it is the same two appraisers in the Colliers office and the exact same appraisal.  The veracity of this arrangement is clearly problematic.[94]

Borenstein offered two possible solutions to this disagreement:  (1) the parties could "immediately instruct the appraisers [to] appoint a third [appraiser], and average the 3 [appraisals] (i.e. $54.6M, $59M and the 3rd)" or (2) calculate the purchase price as the average of the three appraisals as they stood—at $57.5 million.[95]  Borenstein

---

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

stated that this offer would be available until close of business the next day. Neither party accepted the other's offer.

On December 23, 2016, Rowsey, Compatriot's CEO, emailed a settlement proposal to Alan Greenberg, Holtzman's business partner.[96] Included in this proposed settlement was Compatriot's offer to buy or sell the Apartments for $58.25 million.[97] Greenberg responded the next day, explaining that he needed to modify the "overall package" for Holtzman to agree to the purchase price, listing the modified terms in detail.[98] Rowsey responded with Compatriot's counteroffer on December 29.[99] On December 30, Greenberg replied that Holtzman would not agree to Compatriot's terms. Greenberg also reminded Rowsey that he believed the parties had yet to establish a price "determined by three independent appraisers," and that "[u]ltimately, a judge will have to decide."[100] Later that day, Rowsey delivered a long response. Rowsey explained that Platt, on behalf of Holtzman, had proposed using the Mortgage Appraisal as the third appraisal, and that Holtzman wanted to "repudiate" this agreement only after he discovered that the Mortgage Appraisal was

---

[96] Tr. 804:4–808:9 (Greenberg); *see* JX 335.

[97] JX 335.

[98] *Id.*

[99] *See* JX 339.

[100] *Id.*

prepared by the same appraiser as Compatriot's appraisal.[101] Rowsey also insisted that Flanagan was not qualified to serve as an appraiser under the Appraisal Schedule, and instead, his appraisal should be disqualified. Rowsey thus contended that the parties should rely on the two Colliers appraisals, which valued the Apartments at $59 million.[102] Rowsey offered to resolve the dispute by reducing the purchase price by $750,000, acknowledging Greenberg's statement that "a judge may ultimately have to decide the issue" and suggesting that "we can both handicap how that decision is most likely to come out."[103] Rowsey concluded his email by offering to sell the Apartments for $58.25 million in accordance with the VGRP Purchase Right terms, including the January 23, 2017 expiration.[104] On January 2, Greenberg updated Rowsey that he had "made no headway at all" with Holtzman.[105]

Meanwhile, the Holtzman Parties began arranging for another appraisal. On December 16, 2016, Platt emailed Flanagan explaining that the parties disagreed as to the value of the Apartments, and that Flanagan and Albert would need to select a third appraiser pursuant to the Appraisal Schedule.[106] On December 19, Flanagan

---

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] JX 354.

[106] JX 321.

contacted Albert to select a third appraiser, and on December 30, Flanagan informed Borenstein that he and Albert had agreed on a third appraiser, Paul Griffith from Integra Realty Resources, Inc.[107]  On January 5, 2017, Holtzman informed Compatriot that their respective appraisers had agreed on a third appraiser and that he would be engaging Griffith on behalf of MP Holding.[108]  Holtzman continued:

> "We reject your groundless objection to our appraisal and we are reserving our right to challenge your appraisal as not independent. With that reservation, we will nevertheless move forward based on the average of the three values (i.e. $54.6M, $59M and the outcome of Griffith's appraisal).  Closing to occur on January 23, 2017.[109]

Later that day, Compatriot's Jason Koehn sent an email to Albert:  "We are being told that you collaborated with another appraiser at Property Valuation Solutions to select another appraiser for the [Apartments] . . . .  I know that we never had a conversation about this so I was wondering if you had any background on this subject."[110]

The next day, Rowsey responded to Holtzman, contesting his authority to engage an appraiser to prepare what he characterized as a "fourth appraisal," which Rowsey contended was in violation of the Appraisal Schedule.[111]  Rowsey closed

---

[107] *See* JX 330; JX 337.

[108] JX 361.

[109] *Id.*

[110] JX 362.

[111] JX 364.

his email, stating: "We expect you to close the transaction on January 23, 2017, in accordance with the terms of the [MP Holding Operating Agreement]."[112] Rowsey then emailed Griffith, copying Holtzman, Platt, Van Kirk, and Borenstein, explaining that Holtzman did not have "unilateral authority to commit [MP Holding] to any contractual arrangement" under the MP Holding Operating Agreement, and that CCI did not "authorize [MP Holding] to enter into any agreement" with Griffith.[113] On January 13, 2017, Platt emailed Griffith stating that VGRP wanted to engage him for an appraisal of the Apartments.[114]

### E. This Action Commences and a Status Quo Order is Entered

On January 17, 2017, six days before the VGRP Purchase Right deadline, VGRP filed this action against CCI, Compatriot, and VG ECU.[115] VGRP also moved for a temporary restraining order, allowing it to exercise the VGRP Purchase Right and close a Section 10.10 Transaction for $59 million, with $4.4 million to be held in escrow pending the outcome of this litigation.[116] On January 20, the parties stipulated to, and the court granted, an injunctive order, proposed by the Compatriot Parties, that prohibited a Section 10.10 Transaction prior to 30 days following a final,

---

[112] *Id.*

[113] JX 370.

[114] JX 380.

[115] *See* Dkt. 1.

[116] *Id.*

non-appealable judgement by the court (the parties refer to this as the "Status Quo Order").[117] VGRP was required to post a $2 million bond for the Status Quo Order to go into effect (the "Injunction Bond").[118]

## F. Holtzman Seeks a Permanent Mortgage

Back in May 2014, the parties obtained a $36.143 million loan for MP Operating with First Commonwealth Bank to finance the construction of the Apartments, with Holtzman signing as a guarantor (the "Construction Loan").[119] The terms of the Construction Loan permitted the parties to extend the loan's maturity date for three successive one-year periods.[120] Holtzman believed that the Construction Loan would ultimately be replaced by a "permanent loan," which he envisioned being the mortgage he pursued with Freddie Mac (the "Permanent Mortgage").[121]

On October 5, 2016, after the Apartments had reached Stabilization, Borenstein emailed Van Kirk, informing him that Holtzman was "proceeding with the loan application" and that Platt could keep Compatriot "in the loop on the

---

[117] Dkt. 12.

[118] *Id.* ¶ 5.

[119] *See* JX 507 at 148–214 (construction loan); JX 66 (guaranty).

[120] JX 507 at 151–53.

[121] Tr. 11–36 (Holtzman) (describing the difference and between and transition from construction and permanent loans and his expectations as they related to the Apartments).

application."[122] Borenstein also wrote that Holtzman had asked for a final call to see if the parties "could come to terms on something [they] could agree on and finalize."[123] In a December 6 email to First Commonwealth Bank, Compatriot's Koehn wrote that he "assume[d]" the Construction Loan "should be paid off this year," but also acknowledged that it was possible the payment could be delayed until January because "[t]he refinance would happen simultaneously with the buyout of our interests," and Holtzman had until late January to close.[124]

On January 12, 2017, an analyst from HFF—the mortgage broker—circulated the final draft of the HFF mortgage loan commitment *i.e.*, the Permanent Mortgage, via email to Platt, Borenstein, and members of CCA and HFF (the "Commitment").[125] On January 18, Platt circulated an executed version of the Commitment. The attached draft had been signed by Holtzman as an "authorized representative" of MP Operating and anticipated a closing date on or before January 23, 2017.[126] On January 23, Platt authorized HFF to lock the interest rate of the Permanent Mortgage on behalf of MP Operating.[127] No one from the Compatriot

---

[122] JX 208.

[123] *Id.*

[124] JX 923.

[125] JX 397 at 1–2.

[126] *Id.* at 5–6.

[127] JX 424.

Parties was included in the correspondence concerning MP Operating's attainment of the Permanent Mortgage.

Holtzman, acting on behalf of MP Operating, however, was unable to close on the Permanent Mortgage by the January 23 deadline as was initially planned.[128] On February 20, 2017, Holtzman, acting as MP Operating's "authorized signatory," signed an amendment to extend the Commitment's required closing date to March 15.[129] On March 2, counsel for the Holtzman Parties emailed counsel for the Compatriot Parties requesting that the Compatriot Parties give their consent for the Permanent Mortgage, stating that its terms were in compliance with those specified in Section 6.2(e) of the MP Managing Operating Agreement.[130] On March 6, counsel for the Compatriot Parties responded, denying the request and stating that "[a]ny financing for [the Apartments] must be approved by Holtzman and Compatriot, as required by the [MP Holding Operating Agreement] and the Redemption Agreement. Compatriot does not approve the financing."[131] Holtzman, acting again on behalf of MP Operating, subsequently signed another extension with HFF, pushing the closing date out until May 24.[132]

---

[128] *See* JX 431.

[129] JX 464.

[130] JX 477.

[131] JX 481.

[132] JX 484.

On March 31, 2017, Compatriot's Koehn emailed Holtzman's Platt reminding him that the parties were required to provide First Commonwealth Bank with written notice that day if they intended to exercise the Construction Loan's first extension, asking "[i]s something forthcoming today from you guys?"[133] Later that day, Platt responded, stating that a one-year extension "makes no sense" and that the MP Managing Operating Agreement and Business Plan "call for the [Construction Loan] to be paid off at [Stabilization]."[134] Platt continued: "The [Construction Loan] is not permanent financing, and it is time to pay it off. The window of opportunity is closing, the [Permanent Mortgage] that we proposed is a great loan and consistent with the [Business Plan] and [MP Managing Operating Agreement]."[135] On April 3, Compatriot's Paul Rowsey emailed Holtzman and Platt, copying Van Kirk, Koehn, and additional representatives from the Compatriot Parties, stating that if the Holtzman Parties did not consent to an extension of the Construction Loan, then

> the loan must be repaid by May 5 and we intend to issue capital calls under the applicable LLC documents . . . . If you fail to meet that capital call, Compatriot and its affiliates reserve all rights and remedies, including those under the LLC documents to contribute or loan money to the borrower entity . . . in order to pay off the loan.[136]

---

[133] JX 498.

[134] *Id.*

[135] *Id.*

[136] JX 499.

Rowsey then explained that the Permanent Mortgage was "above what we believe is prudent leverage at this stage of the market cycle" and that, as things stood, "the only prudent alternative" was to "extend the [Construction Loan's] maturity while we work out this dispute."[137]  On April 14, Holtzman responded, countering that his plan was "prudent, consistent with prior precedent and consistent with best practices in the . . . industry."[138]  He also expressed that the parties "never intended to use the extension rights in the [Construction Loan] beyond the time needed to complete the [Apartments]" and that the "extensions [*sic*] rights are, in effect, 'insurance' to carry us through a period where permanent financing is not available," whereas there was presently "an outstanding opportunity for permanent financing."[139]  On April 21, Rowsey replied, stating that the Compatriot Parties would respond "in the context of . . . litigation" in lieu of responding any further via email.[140]

### G. The Pennsylvania Action

On April 18, 2017, LAV—a minority investor in MP Operating and a non-party to these proceedings—filed an emergency petition in the Court of Common Pleas of Allegheny County, Pennsylvania (the "Pennsylvania Court").  LAV alleged

---

[137] *Id.*

[138] JX 509.

[139] *Id.*

[140] *Id.*

that a "deadlock" had formed between VGRP and CCI and requested that a custodian be appointed to manage MP Operating (the "Pennsylvania Action").[141] LAV filed the suit with Holtzman's encouragement, and he even agreed to pay its corresponding attorneys' fees and expenses.[142] On May 2, the Pennsylvania Court appointed a custodian to MP Operating "to take any and all reasonable and lawful action necessary to avoid default on existing [MP Operating] debts and obligations."[143] The custodian extended the Construction Loan maturity date to May 5, 2018 shortly thereafter.[144]

On February 14, 2018, the Pennsylvania Court appointed a special master (the "Special Master"), who was "empowered," in part, "to conduct and conclude a sale process" for the Apartments.[145] On May 10, the Special Master engaged a broker to sell the Apartments.[146] In July 2018, both Holtzman affiliate CCA and Compatriot submitted bids of $58.5 and $58.75 million, respectively; six other interested parties also submitted bids.[147] After the broker and Special Master requested that all bidders

---

[141] JX 507 at 21–35; *see also* PTO, III ¶ 27.

[142] Tr. 115:16–116:13 (Holtzman).

[143] JX 525.

[144] Dkt. 608 at 34.

[145] JX 637; *see also* PTO, III ¶ 28.

[146] JX 747 ¶ 3.

[147] *Id.* ¶¶ 5, 7, 8.

submit their best and final offers, CCA increased its offer to $58.75 million.[148]  On

September 28, 2018, the Special Master recommended to the Pennsylvania Court

that the Apartments be sold to CCA.[149]  The Compatriot Parties filed objections to

the Special Master's recommendation.[150]  On October 15, 2018, after holding a

hearing on the Compatriot Parties' objections, the Pennsylvania Court approved the

sale of the Apartments to CCA.[151]

Despite having prevailed in the bid process, however, the Holtzman Parties

did not purchase the Apartments.  The Holtzman Parties substituted VGRP as the

buyer in place of CCA, and VGRP executed the purchase agreement to acquire the

Apartments for $58.75 million.[152]  Closing was scheduled to occur on November 19,

2018.[153]  VGRP ultimately failed to meet various closing conditions under its Court-

supervised purchase agreement.[154]  In connection with those failures, the Special

Master found that VGRP had not provided "any assurances or evidence that it

possesse[d] the equity or ha[d] obtained financing sufficient to close the

---

[148] *Id.* ¶¶ 9, 10.

[149] *Id.* ¶ 12.

[150] *Id.* ¶ 13.

[151] *Id.* ¶ 14.

[152] *Id.* ¶ 15; *id.*, Ex. A § 3(a).

[153] JX 747 ¶ 18.

[154] *Id.* ¶¶ 29–35.

transaction," and thus began searching for other potential purchasers.[155] On December 28, CCI offered to purchase the Apartments for $57.5 million, which the Special Master recommended be approved.[156]

On April 11, 2019, the Pennsylvania Court entered an order authorizing the Special Master to execute on behalf of MP Operating a sale of the Apartments to CCI.[157] The Pennsylvania Court also approved of a distribution schedule proposed by the Compatriot Parties to distribute the net proceeds from the sale of the Apartments to LAV and MP Managing.[158] But the Pennsylvania Court ordered that the Special Master "pay the net sales proceeds owing to [MP Managing], including all amounts currently held by [the Apartments], to the Delaware Chancery Court for resolution of the disputes and claims between [MP Managing's] members," absent the written consent of both VGRP and the Compatriot Parties.[159] The Pennsylvania Court also authorized the Special Master to retain $2,250,000 of the net sale proceeds to pay for the Apartments' "remaining expenses and liabilities," which is held in an escrow account.[160] The escrow account had a balance of $2,231,728.49 as of April

[155] *Id.* ¶¶ 36, 37.

[156] *Id.* ¶¶ 38, 40.

[157] JX 762 ¶ 3; *see also* PTO, III ¶ 29.

[158] JX 762 ¶ 4 & Ex. B (distribution schedule).

[159] *Id.* ¶ 4.

[160] Dkt. 420, Exhibit to Special Master Chiafullo's Letter – March 24, 2020 Order ¶ 5.

9, 2021. On April 22, 2019, the Apartments were sold to CCI.[161] On April 15, 2020, the Special Master transferred the net sale proceeds owed to MP Managing, which totaled $16,325,035.44, to the Register in Chancery, where they remain to this day.[162] On April 21, 2021, in response to an appeal by VGRP, the Superior Court of Pennsylvania affirmed the Pennsylvania Court's April 11 order.[163]

### H.     This Action Proceeds

While the Pennsylvania Action proceeded, this case moved forward as well. On June 22, 2020, this court issued a memorandum opinion addressing the parties' cross-motions for partial summary judgment (the "Summary Judgment Opinion"). *See In re Morrow Park Holding LLC*, 2020 WL 3415649 (Del. Ch. June 22, 2020). The court denied the Holtzman Parties' motion and denied the Compatriot Parties' motion in part, determining that (1) there remained general disputes of material fact; (2) the discovery record had yet to be fully developed, even after the cross motions had been fully briefed; and (3) trial had been scheduled to take place the following

---

[161] PTO, III ¶ 30.

[162] Dkt. 420 (letter from Special Master to the court alerting the court as to the Pennsylvania Court's order); Dkt. 427 (receipt from Register in Chancery confirming transfer of sale proceeds from Special Master).

[163] JX 837; *see also* PTO, III ¶ 32.

month.[164] *Id.* at *1.[165] The court reasoned that the second and third factors "warrant[ed] denial of the motions on certain claims and issues so that the Court may 'inquire more thoroughly into the facts in order to clarify application of the law.'" *Id.* (quoting *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005)).

Throughout these proceedings, the court had twice increased the amount of the Injunction Bond. First, on October 22, 2018, the court raised the Injunction Bond to $3.9 million; VGRP subsequently met this obligation.[166] Then on May 6, 2020, the court increased the Injunction Bond by $1,900,135.30.[167] On July 27, 2020, the Holtzman Parties informed the court that they would be unable to satisfy the new Injunction Bond.[168] The court accordingly vacated the Status Quo Order the next day, ordering the vacatur to be effective as of July 27, 2020.[169]

A six-day trial was held between June 7 and June 14, 2021, during which the parties submitted 931 joint exhibits and called 12 witnesses.

---

[164] On June 25, 2020, the parties agreed to postpone the trial. *See* Dkt. 550.

[165] The court granted summary judgment for the Compatriot Parties on the Holtzman Parties' promissory estoppel and civil conspiracy claims. *Morrow Park*, 2020 WL 3415649, at *19–20, *21.

[166] Dkt. 211 at 19:9–17; Dkt. 207.

[167] Dkt. 438 ¶ 29.

[168] Dkt. 590.

[169] Dkt. 592.

## II. ANALYSIS

The remaining issues to be resolved in this case all depend on the court's interpretation of various agreements between the parties and whether any of those agreements were breached. "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003). A party asserting a breach of contract claim bears the burden of proving a breach by a preponderance of the evidence. *Base Optics Inc. v. Liu*, 2015 WL 3491495, at *13 (Del. Ch. May 29, 2015). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002).

### A. Did Compatriot Breach the Operating Agreements?

The Holtzman Parties argue that the Compatriot Parties breached both the MP Holding Operating Agreement and the MP Managing Operating Agreement. According to the Holtzman Parties, CCI's failure to comply with the Appraisal Schedule was a breach of the MP Holding Operating Agreement, and the Compatriot

Parties' refusal to approve the Permanent Mortgage was a breach of the MP Managing Operating Agreement.

### 1. Was There a Breach of the MP Holding Operating Agreement?

The Holtzman Parties present three different theories of the Compatriot Parties' breach of the MP Holding Operating Agreement's Appraisal Schedule. First, they argue that Compatriot's insistence on using two appraisals created by the same appraiser, Todd Albert of Colliers, constituted a breach. Second, they contend that Compatriot breached when it rejected Flanagan's appraisal. Third, they assert that Compatriot's refusal to close on a sale of the Apartments after VGRP offered to remit the $59 million valuation calculated in both of Albert's appraisals was also a breach of the Appraisal Schedule.

### a. The Mortgage Appraisal's Legitimacy

The Holtzman Parties argue that Compatriot "manipulated" the appraisal process by insisting that its selected appraiser, Todd Albert, be allowed to also submit the Mortgage Appraisal as the third appraisal contemplated in the Appraisal Schedule.[170] The Appraisal Schedule states that "[n]o appraiser shall have any personal or financial interest as would disqualify such appraiser from exercising an

---

[170] Dkt. 654 ("Holtzman Op. Br.") at 20.

independent and impartial judgment as to the value of [the Apartments]."[171] According to the Holtzman Parties, Albert could not meet the Appraisal Schedule's independence qualification when he conducted his second appraisal of the Apartments, and therefore, the Mortgage Appraisal should not have been considered as part of the appraisal process.

The Holtzman Parties do not dispute that the same appraisal firm could have conducted two, independent appraisals; rather, they challenge the ability of an individual appraiser to be independent when administering a second appraisal of the same property. Platt testified that this was the Holtzman Parties' understanding during the appraisal process negotiations.[172] He explained that while the Holtzman Parties would not have objected to Colliers being the appraisal firm responsible for administering the two, non-VGRP appraisals, the expectation was that each appraisal would have been conducted by a different appraiser at the firm.[173] The Holtzman Parties contend that the language of the Appraisal Schedule corresponds with their understanding: that three, different, independent, individual appraisers are

---

[171] MP Holding Operating Agreement, Schedule C.

[172] Tr. 492:23–493:11 (Platt).

[173] *Id.*; *see also id.* at 77:4–13 (Holtzman) ("[I]f it would have been a third person, the suggestion that the lender appraisal could be used as a third would make perfect sense. But the fact that it was the same person did not make for three different appraisers.").

required.[174] The problem with the Holtzman Parties' argument is its failure to consider that neither side adhered to the contractually prescribed appraisal process. Instead, the parties agreed to modify that process.

The MP Holding Operating Agreement provides for its modification if approved by both CCI and VGRP.[175] This provision is in accordance with "the basic principle of contract law that the consent of all parties to a contract is necessary to amend the contract." *In re WeWork Litig.*, 2020 WL 6375438, at *10 (Del. Ch. Oct. 30, 2020). On October 19, 2016, Platt, acting on behalf of VGRP, emailed Van Kirk, reminding him that VGRP had "proposed using the mortgage loan appraisal for the third appraisal, in lieu of having these two appraisers select a third."[176] Van Kirk responded that "[u]sing the mortgage loan appraisal is ok with us," *i.e.*, CCI.[177] The parties agree that this exchange modified the Appraisal Schedule, but disagree as to the scope of that modification. The Holtzman Parties contend that the Appraisal Schedule still required three, different, independent, individual appraisers following

---

[174] Holtzman Op. Br. 21.

[175] MP Holding Operating Agreement § 15.6; *see id.* § 5.1.

[176] JX 237.

[177] *Id.*

46

the modification, while the Compatriot Parties assert that the modification extinguished all of those qualifications as applied to the Mortgage Appraisal.[178]

Delaware adheres to the objective theory of contracts. The objective theory of contracts requires the court to construe a contract as it would be "'understood by an objective, reasonable third party.'" *Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)); *accord Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014). If a contract's language is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions. *Osborn*, 991 A.2d at 1159–60. A contract is ambiguous if the court is able to "reasonably ascribe multiple and different interpretations to a contract." *Id.* at 1160. The "determination of ambiguity lies within the sole province of the court." *Id.* "The primary consideration in the construction of contract language is to fulfill, to the extent possible, the reasonable expectations of the parties at the time they contracted." *Bell Atl. Meridian Sys. v. Octel Commc'ns Corp.*, 1995 WL 707916, at *5 (Del. Ch. Nov. 28, 1995).

---

[178] *Compare* Holtzman Op. Br. 21 ("[The Appraisal Schedule] requires three 'independent' 'appraisers'—it does not merely require three different 'appraisals.'"), *with* Compatriot Op. Br. 35 ("[The Holtzman Parties' opening brief] incorrectly assumes [the Appraisal Schedule's] appraiser requirements apply to the Freddie Mac Appraisal.").

Here, both sides' interpretations of the scope of the Appraisal Schedule's modification are reasonable. The modification did not impose any explicit limitations on who could conduct the mortgage appraisal. Yet the Appraisal Schedule contained specific qualifications for each appraiser. It is thus unclear to what extent the subsequent modification overrode the Appraisal Schedule's qualifications for the mortgage appraiser. Therefore, the modification of the Appraisal Schedule was ambiguous.

"When contractual language is reasonably susceptible to more than one meaning, all objective extrinsic evidence is considered: the overt statements and acts of the parties, the business context, prior dealings between the parties, and the business customs and usage in the industry." *Bell Atl. Meridian Sys.*, 1995 WL 707916, at *6. A "party seeking judicial enforcement of their interpretation of the ambiguous language" may prevail by "show[ing] by a preponderance of the evidence that the other party knew or had reason to know of the meaning they attached to the language." *Id.* (citing Restatement (Second) of Contracts § 201 (1981) and *Corbin on Contracts* § 543 (1960)); *see also Kabakoff v. Zeneca, Inc.*, 2020 WL 6781240, at *20 (Del. Ch. Nov. 18, 2020) (observing that the court must "discern the intended meaning" of the contract "from the preponderance of the extrinsic evidence" (internal citations omitted)). A court may interpret ambiguous language "in favor of the non-drafting party or against the interests of the drafting

party." *In re Appraisal of Metromedia Int'l Grp., Inc.*, 971 A.2d 893, 904 n.30 (Del. Ch. 2009). "The parties' course of performance under a contract is a powerful indication of what the correct interpretation of that contract is." *Senior Hous. Cap., LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *31 (Del. Ch. May 13, 2013). Consequently, when confronted with ambiguous language, the court may look to the actions of the parties following the contract's formation to determine their original intent. *Schwartz v. Centennial Ins. Co.*, 1980 WL 77940, at *5 (Del. Ch. Jan. 16, 1980).

The modification to the Appraisal Schedule reflected in the parties' emails is devoid of any conditions or qualifications on the use of the Mortgage Appraisal. Platt's October 19 email proposed employing a process that the Appraisal Schedule did not contemplate. This suggests that the parties may have understood that the qualifications in the Appraisal Schedule governing the appraisers and appraisals did not apply to the Mortgage Appraisal. Alternatively, the modification may have served as an addendum to the Appraisal Schedule permitting the selection of the Mortgage Appraisal rather than having the parties' appraisers select the third appraiser, with the Mortgage Appraisal and its corresponding appraiser being subject to the qualifications in the Appraisal Schedule. Because the language used in the modification is open-ended, the court examines the parties' actions following the modification to determine how broadly they understood its scope to be.

49

The Holtzman Parties' argument that it was a violation of the parties' agreement to use Albert's two appraisals is inconsistent with the Holtzman Parties' own conduct during the process. The documentary record establishes, and Platt admitted, that VGRP discussed with HFF the possibility of using Flanagan as the mortgage appraiser.[179] On October 21, 2016, Platt emailed Nick Matt, a Senior Managing Director at HFF, asking if HFF had selected its appraiser.[180] Later that day, Matt responded, "no appraisers selected . . . . I didn't call your guy yet. Let's play out the app and then we can discuss and select the appraiser."[181] When confronted with this exchange, Platt testified that his conversation with Matt was not an attempt to have Flanagan serve as both VGRP and HFF's appraiser, maintaining that VGRP would have used another appraiser if Flanagan had been selected by HFF.[182]

The Holtzman Parties insist that their conduct is not comparable to Compatriot's manipulation of the appraisal process by using both of Albert's appraisals. That argument is not credible. The Holtzman Parties cite no evidence indicating that anyone from Compatriot pushed HFF to select Albert as Platt did with

---

[179] Tr. 493:12–18 (Platt); *see also* JX 212 (Platt providing Flanagan's contact information to an HFF representative via an October 6, 2016 email).

[180] JX 245.

[181] *Id.*

[182] Tr. 494:10–495:14 (Platt); *see also id.* at 493:12–18 (Platt).

respect to Flanagan. At best, the Holtzman Parties assert that Compatriot "was fully aware that [HFF] was attempting to hire its previously selected appraiser."[183] The Holtzman Parties cannot point to any provision in either the Appraisal Schedule, the broader MP Holding Operating Agreement, or any other applicable source of law that the Compatriot Parties owed the Holtzman Parties any duty to replace Albert as their appraiser or to ever notify the Holtzman Parties of HFF's decision.

The parties displayed a mutual understanding of the modified Appraisal Schedule that permitted HFF to select a third appraiser who could be identical to one already chosen by VGRP or CCI. The Compatriot Parties were aware of HFF's engagement of Colliers and Albert during the appraisal process well in advance of the delivery of the final appraisals. But there is no evidence that they attempted to conceal this information or expressed concern in internal communications over the validity of relying on two appraisals generated by the same appraiser. Either reaction might otherwise evince an acknowledgement that using Albert for two of the three appraisals was contrary to the parties' modification to the Appraisal Schedule. On the other hand, Platt's actions on the other side of the process reflect the Holtzman Parties' understanding that, pursuant to their modification to the agreement, one person could perform two of the three appraisals. Indeed, Platt's encouragement of

[183] Holtzman Op. Br. 21.

51

HFF to engage Flanagan demonstrates that VGRP believed that its chosen appraiser could serve as the mortgage appraiser as well. The Holtzman Parties' self-serving testimony that they would have substituted another appraiser for Flanagan if he had been selected by HFF is not credible. There is no contemporaneous evidence that the Holtzman Parties had taken steps to identify or select a potential replacement for Flanagan in the event that HFF were to select him to prepare the Mortgage Appraisal.

The parties' actions are also consistent with a reasonable reading of the independence provision in the Appraisal Schedule, regardless of whether it applied to the Mortgage Appraisal. The parties disagree as to the meaning of the phrase "independent and impartial judgment" within the sentence of the Appraisal Schedule that reads: "No appraiser shall have any personal or financial interest as would disqualify such appraiser from exercising an independent and impartial judgment as to the value of the [Apartments]."[184] Under *noscitur a sociis*, a canon of construction meaning "it is known by its associates,"[185] an ambiguous contractual term may be interpreted by the words immediately surrounding it. *See AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *58 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021). In the Appraisal Schedule, the words "independent" and "impartial" are immediately preceded by "personal or financial

---

[184] MP Holding Operating Agreement, Schedule C ¶ 2.

[185] *Noscitur a sociis*, BLACK'S LAW DICTIONARY (11th ed. 2019).

interest." The Appraisal Schedule thus only considers personal or financial conflicts as disqualifying conflicts of interest.

The Holtzman Parties contend that "Colliers could not be independent from itself because it had just appraised the Property for Compatriot and relied on the same information it previously obtained from Compatriot to appraise the [P]roperty."[186] Neither of these facts warrants disqualification under the Appraisal Schedule's independence provision. Furthermore, the Holtzman Parties present no evidence that Colliers or Albert had any personal or financial interest that would undermine their independence. Nor is the caselaw that the Holtzman Parties rely on persuasive.

In *Scott v. Arden Farms Co.*, 28 A.2d 81 (Del. Ch. 1942), dissenting stockholders to a merger sought an appraisal under the Delaware General Corporation Law. At that time, the applicable appraisal statute permitted an eligible dissenting stockholder to "demand an appraisal of his stock by three disinterested persons, one of whom shall be designated by the stockholder, one by the directors of the resulting or surviving corporation and the other by the two designated as aforesaid." *Id.* at 83. In *Arden Farms*, the company objected to the dissenting stockholders' chosen appraiser, John L. Davis, on account of him not being

_____

[186] Holtzman Op. Br. 22.

"'disinterested' . . . within the meaning of the statute." *Id.* at 84. Davis was a member of an investment advisory firm that had been previously hired on behalf of the dissenting stockholders to negotiate with the company for an "acceptable price" for their stock. *Id.* Davis had also conveyed advice to a dissenting stockholder that eventually led to the stockholder voting against the merger. *Id.* at 85. Following the merger vote, Davis provided the dissenting stockholder with a "detailed report," which included a valuation of the plaintiffs' stock. *Id.* Citing the Corpus Juris Secundum and a case quoting numerous dictionary definitions, the court determined that "disinterested" "plainly means something more than not having a pecuniary interest in the controversy; it connotes fair-mindedness, including freedom from actual or probable bias, prejudice or partiality with relation to the questions to be determined." *Id.* The court then reasoned that although the facts in its case did not lead to the inevitable conclusion that Davis

> would necessarily act unfairly in appraising the stock . . . [,] the risk that his judgment might be influenced, consciously or subconsciously, by his previous conclusions and recommendations, or by a tendency to attempt to justify them, is such that he should not be expected to act with the freedom of mind required.

*Id.* at 86. Therefore, the court concluded that Davis could not be "disinterested" for the purpose of the appraisal statute. *Id.*

*Arden Farms* is distinguishable. There, the court interpreted a public statute that had no nearby words to help inform the reader as to the scope of the word

54

"disinterested." The court thus relied on broad definitions originating from a multitude of secondary sources to reach its interpretation. Here, however, in construing a single-use schedule in a private contract, the court is able to depend on the surrounding language to determine the scope of the phrase "independent and impartial." The parties drafted a detailed, albeit imperfect, process to be followed in the Appraisal Schedule. They later abandoned this carefully negotiated process with an informal and ambiguous amendment that VGRP initiated and documented solely in emails. The Holtzman Parties are now attempting to rewrite the Appraisal Schedule yet again, despite having had this opportunity twice before. "As the . . . entity in control of the process of articulating the terms" of the modification to the Appraisal Schedule, "it was incumbent upon [VGRP] to make [its] terms clear." *Juul Labs, Inc. v. Grove*, 238 A.3d 904, 911 (Del. Ch. 2020) (internal quotations omitted). The Holtzman Parties point to little evidence, apart from their own witnesses' testimony, that supports their reading of the Appraisal Schedule. Given their role in drafting the modification to the Appraisal Schedule, the Holtzman Parties' *post hoc* interpretation of that modification is not credible. The Holtzman Parties have thus not met their burden of a preponderance of the evidence. Based on the language of the Appraisal Schedule and the extrinsic evidence that the court has considered to resolve any ambiguity, the Mortgage Appraisal prepared by Colliers and Albert was a valid, third appraisal. Therefore, the Compatriot Parties'

55

insistence on using the Mortgage Appraisal as a third appraisal under the Appraisal Schedule did not constitute a breach.

### b. Compatriot's Objection to Flanagan

The Compatriot Parties contend that Flanagan's appraisal was invalid because Flanagan did not "meet the standards set forth in [the Appraisal Schedule]."[187] Specifically, Compatriot contends that Flanagan did not "specialize in the appraisal of real estate projects similar to [the Apartments] in the region where [the Apartments] are located."[188] It is undisputed that Compatriot did not raise this objection until after it received Flanagan's appraisal, and weeks after Flanagan told Compatriot that he could not serve as Compatriot's appraiser because the Holtzman Parties had contacted him first to serve as their appraiser. The Holtzman Parties argue that Flanagan was qualified, and that the Compatriot Parties' objection to Flanagan was pretextual and made in bad faith. The Holtzman Parties present this argument as a direct breach of the Appraisal Schedule,[189] but this claim more closely resembles a breach of the implied covenant of good faith and fair dealing. Rather than direct the court to a specific obligation that Compatriot failed to fulfill, the Holtzman Parties argue that Compatriot raised "[c]ontrived [o]bjections" to

---

[187] JX 315.

[188] MP Holding Operating Agreement, Schedule C.

[189] Holtzman Op. Br. 14–20, 29.

"frustrat[e] operation of the three-independent appraiser process."[190] The Holtzman Parties raise the implied covenant as a fallback to the extent the court does not hold that there was a direct breach of the Appraisal Schedule, but fail to explain how any of their claims would otherwise be viable under an implied covenant theory.[191]

Every contract governed by Delaware law is subject to the implied covenant of good faith and fair dealing. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441–42 (Del. 2005). The implied covenant of good faith and fair dealing "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Id.* at 442 (internal quotations omitted). The implied covenant is used to "infer contract terms to handle developments or contractual gaps that . . . neither party anticipated." *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (internal quotations omitted). It applies only where a contract "lacks specific

---

[190] *Id.* at 14.

[191] *See id.* at 30. The entirety of the Holtzman Parties' implied covenant argument regarding the Appraisal Schedule reads:

> "The implied covenant of good faith and fair dealing inheres in every contract governed by Delaware law and requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." June 22, 2020 Mem. Op. at 49 (quotations omitted). Here, as explained throughout, Defendants' conduct was designed to – and, in fact, did – prevent Holtzman "from receiving the fruits of the bargain." *See Id.* [*sic*] at 52 (discussing application here).

*Id.*

language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract." *All. Data Sys. Corp. v. Blackstone Cap. P'rs V L.P.*, 963 A.2d 746, 770 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009). Thus, the doctrine "ensures that the parties deal honestly and fairly with each other when addressing gaps in their agreement." *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021).

"Despite the appearance in its name of the terms 'good faith' and 'fair dealing,' the covenant does not establish a free-floating requirement that a party act in some morally commendable sense. Nor does satisfying the implied covenant necessarily require that a party have acted in subjective good faith." *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 182–83 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE); *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *17 (Del. Ch. Nov. 17, 2014) ("A breach of the implied covenant also does not necessarily require that a party have acted in bad faith."). Rather, these terms connote that a party take actions that are consistent with the agreement and its purpose. *MHS Cap. LLC v. Goggin*, 2018 WL 2149718, at *11 (Del. Ch. May 10, 2018). Thus, "[w]hen exercising a discretionary right, a party to the contract must exercise its discretion reasonably." *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 419 (Del. 2013) (quoting and adopting the reasoning in *ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440–42

(Del. Ch. 2012), *rev'd on other grounds*, 68 A.3d 665 (Del. 2013)), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013). And consequently, a party's failure to exercise its contractually granted discretion reasonably breaches the implied covenant embedded in that agreement. *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146–47 & n.1 (Del. Ch. 2009) (collecting cases). "[T]he elements of an implied covenant claim are those of a breach of contract claim: a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *NAMA Hldgs.*, 2014 WL 6436647, at \*16 (internal quotations omitted).

The Holtzman Parties do not identify a gap in the Appraisal Schedule. Instead, they argue that the Compatriot Parties objected in bad faith to Flanagan's qualifications. Although the Appraisal Schedule articulates particular qualifications for the appraisers, it is silent as to how the parties would ensure that the appraisers met those qualifications *i.e.*, an objection procedure. The ability of a party to exercise an objection in this scenario would be inherently discretionary. To avoid a breach of the implied covenant, such discretion could not be exercised in bad faith. The court need not invent a detailed objection procedure to fill this apparent gap. Rather, given the Holtzman Parties' argument, the relevant inquiry is: if a procedure to object to an appraiser existed, was the Compatriot Parties' objection to Flanagan

59

made in bad faith, and if so, did that bad-faith objection damage the Holtzman Parties?

The Holtzman Parties argue that Flanagan's appraisal experience met the Appraisal Schedule's standards, which required that he "specialize in the appraisal of real estate projects similar to [the Apartments] in the region where [the Apartments] are located, shall have no less than five years' experience in such field and shall be recognized as ethical and reputable."[192] Flanagan is a member of the Appraisal Institute, which requires its members to take classes, gain specialized experience, and write reports to achieve their certification.[193] He has been a principal at Property Valuation Advisors since 1992, is licensed as a certified general appraiser in nine states, conducts 400 to 500 appraisals per year, and has conducted appraisals in all 50 states.[194] Additionally, Flanagan has conducted ten appraisals in the Pittsburgh metro area.[195] Between four and five of those appraisals occurred outside of Pittsburgh proper, in his hometown, Youngstown, Ohio, which is about a

---

[192] MP Holding Operating Agreement, Schedule C ¶ 2.

[193] Tr. 633:11–634:14 (Flanagan); *see also AI Designations*, APPRAISAL INSTITUTE, https://www.appraisalinstitute.org/our-designations/ (last visited Aug. 1, 2022).

[194] Tr. 634:22–635:12, 637:21–23, 636:7–11 (Flanagan).

[195] *Id.* at 636:12–17 (Flanagan).

45 minute drive from the city.[196] Flanagan also testified that he had appraised "[m]aybe 20" properties in the greater State of Pennsylvania.[197]

The Compatriot Parties assert that Flanagan testified that he did not "specialize in anything" when asked if he "specialized in appraising any type of property in the northeastern part of the United States."[198] They also note that, before appraising the Apartments, Flanagan had not conducted an appraisal in Pennsylvania since 2012.[199] Furthermore, the Compatriot Parties contend that the parties understood the "region" referred to in the Appraisal Schedule to mean the "Pittsburgh area" and that the above evidence is insufficient to prove that Flanagan possessed the requisite appraisal experience for that region.[200] The Holtzman Parties, however, argue for a broader reading of "region" that encompasses the entire Midwest.[201] It is clear from the parties' arguments that they disagree as to the meaning of the language in the Appraisal Schedule, specifically the language concerning the necessary qualifications for a selected appraiser. Therefore, the court

---

[196] *Id.* at 636:18–637:8 (Flanagan).

[197] *Id.* at 638:6–11 (Flanagan).

[198] *Id.* at 666:16–21 (Flanagan); *see also id.* at 667:17–21 (Flanagan) (Q. . . . We can agree there is nothing in there that says that you specialize in projects in any particular region in the country. You can agree with that, correct?. A. Correct.).

[199] *See id.* at 665:4–10 (Flanagan).

[200] Compatriot Op. Br. 37 (internal quotations omitted).

[201] Holtzman Op. Br. 19.

must first determine what qualifications the Appraisal Schedule required for a given appraiser in order to decide whether the Compatriot Parties objected to Flanagan in bad faith.

If a contract's language is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions. *Osborn*, 991 A.2d at 1159–60. A contract is ambiguous if the court is able to "reasonably ascribe multiple and different interpretations to a contract." *Id.* at 1160. The "determination of ambiguity lies within the sole province of the court." *Id.* "The primary consideration in the construction of contract language is to fulfill, to the extent possible, the reasonable expectations of the parties at the time they contracted." *Bell Atl. Meridian Sys.*, 1995 WL 707916, at \*5. The parties do not identify language in the greater MP Holding Operating Agreement that is similar to the language at issue in the Appraisal Schedule; nor has the court been able to locate any on its own. And the language at issue in the Appraisal Schedule is subject to multiple reasonable interpretations, two of which are promoted by the parties. Therefore, the court may consider extrinsic evidence when interpreting the meaning of the language at issue in the Appraisal Schedule.

Because the parties have not defined the contractual terms at issue here, the court may turn to a dictionary as a reliable source to determine what the parties intended. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del.

2006) ("[D]ictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract."); *accord Tetragon Fin. Grp. Ltd. v. Ripple Labs Inc.*, 2021 WL 1053835, at *4 (Del. Ch. Mar. 19, 2021); *see also Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *10 (Del. Ch. July 6, 2018) ("in the case of an undefined term [in a contract], the interpreting court may consult the dictionary, if that is deemed useful, when determining the term's plain meaning"). Dictionary definitions of "region" include: "a broad geographic area distinguished by similar features"[202] and "[a] political district or unit, often with its adjacent lands."[203] Black's Law Dictionary defines "National Capital Region" as "[t]he District of Columbia and six nearby counties: Montgomery and Prince George's in Maryland. and Fairfax, Loudoun, Prince William, and Arlington in Virginia."[204] These definitions indicate that "region," when used to modify a geographic territory, encompasses the adjacent areas that share similar features with that territory.

Based on the record and the above dictionary definitions, the Pittsburgh area is the more reasonable interpretation of the region referenced in the Appraisal

---

[202]     *Region*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/region (last visited Aug. 1, 2022).

[203] *Region*, THE AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://ahdictionary.com/word/search.html?q=region (last visited Aug. 1, 2022).

[204] *National Capital Region*, BLACK'S LAW DICTIONARY (11th ed. 2019).

Schedule. This region includes not just the City of Pittsburgh, but the greater surrounding area as well. Tellingly, the Compatriot Parties argue that the court use the Pittsburgh area, not Pittsburgh. Additionally, the parties jointly describe the Apartments as being located in Pittsburgh.[205] Using the definitions above, the Pittsburgh region includes like areas surrounding the City. Flanagan's experience in the area surrounding Pittsburgh *i.e.*, the Pittsburgh metro area, is accordingly within the Pittsburgh region.[206]

Dictionary definitions of "specialize" include: "to concentrate one's efforts in a special activity, field, or practice"[207] and "[t]o provide something in particular or have something as a focus."[208] Flanagan has appraised ten properties in the Pittsburgh metro area. This is a sufficient concentration of Flanagan's appraisal efforts to demonstrate that he specialized in the Pittsburgh region. The Compatriot Parties do not specify where Flanagan's qualifications are lacking; nor do they

---

[205] PTO, III ¶ 1.

[206] Todd Albert, the Compatriot Parties' appraiser, relied on data from the "Greater Pittsburgh MSA," or metropolitan statistical area, when conducting his appraisal. *See* JX 257 at -0696–0702. Albert testified that this region was chosen for his analysis because it was "the most relevant area," and agreed that Colliers "typically use[d] the Greater Pittsburgh MSA to define the relevant region." Albert Oct. 10, 2019 Dep. 111:16–112:11, 113:2–5.

[207] *Specialize*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/specialize (last visited Aug. 1, 2022).

[208] *Specialize*, THE AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://ahdictionary.com/word/search.html?q=specialize (last visited Aug. 1, 2022).

explain what minimum experience he would need to be qualified under the Appraisal Schedule. Instead, they generally argue that Flanagan "did not specialize in Pittsburgh-area appraisals," pointing to his testimony where he admitted that he did not "specialize in anything."[209] But when asked if he had a "specialty in terms of appraisals," Todd Albert, the Compatriot Parties' appraiser testified that his specialty was "[c]ommercial real estate," without specifying a particular region.[210] Indeed, at his deposition, Albert stated that he was qualified to perform an appraisal in any state as long as he took the "necessary competency steps" so that he obtained either a temporary or permanent license to conduct an appraisal in the state in question.[211] And despite testifying that he specialized in commercial real estate, Albert later agreed that he was also "generally qualified to appraise apartment buildings."[212] The Compatriot Parties agreed, representing to the Holtzman Parties that Albert "specializes in the appraisal of multifamily projects in the Pittsburgh area" during the appraisal process.[213] Thus, it appears that the Compatriot Parties did not hold their own appraiser to the same exacting (yet ambiguous) standard to which they held Flanagan.

---

[209] Compatriot Op. Br. 37–38; Tr. 666:16–21 (Flanagan).

[210] Albert Oct. 10, 2019 Dep. 19:25–20:2.

[211] *Id.* at 31:10–32:5.

[212] *Id.* at 31:6–9.

[213] JX 237.

The circumstances surrounding the Compatriot Parties' objection are similarly dubious. Early in the appraisal process, the Compatriot Parties had initially sought to engage Flanagan as their own appraiser. Prior to the Compatriot Parties' inquiry into Flanagan's availability, he and Property Valuation Advisors had conducted appraisals for the Village Green entities on 27 separate occasions, most of which occurred under Compatriot's ownership. It is thus reasonable to conclude that the Compatriot Parties were familiar, and satisfied, with both Flanagan and Property Valuation Advisors' previous appraisal work. The Compatriot Parties counter that they merely contacted Flanagan to confirm that he was qualified to be an appraiser under the Appraisal Schedule.[214] But this is belied by the contemporaneous record evidence. On October 10, 2016, Koehn emailed Flanagan, with his initial inquiry as to Flanagan's availability:

> we are still partners with [Holtzman] on a couple of new developments that are being completed in Pittsburgh and the methodology for coming up with a price through a 3 appraisal methodology and we have the ability to select one appraiser and we would like to engage your team to complete the appraisal. Please let me know if you have time in the next day or so to discuss and I can give you more of the details.[215]

Koehn later testified that, in this email, "I meant that if Mr. Flanagan was available and met the requirements under [the Appraisal Schedule], that we would like to

---

[214] Compatriot Op. Br. 37 n.29.

[215] JX 224.

66

engage him."[216] Mr. Koehn's testimony, coming almost five years after this email, is unconvincing. The email does not indicate that Flanagan or his firm's qualifications would need to be assessed.

The evidence also points to members of the Compatriot Parties' harboring no doubt as to Flanagan and Property Valuation Advisors's qualifications. At trial, Koehn testified that he was unacquainted with Flanagan's previous appraisal experience and Van Kirk disclaimed knowing of Flanagan altogether at the time Koehn attempted to engage him.[217] Yet, despite their purported lack of familiarity with Flanagan, the Compatriot Parties expressed conspicuous disappointment at being unable to retain his services. After Flanagan turned down the proposed engagement, Van Kirk first emailed Rowsey informing him that "Holtzman already hired the appraiser we wanted" and that Koehn "was a little worried that this might happen."[218] Van Kirk emailed Koehn almost immediately after finishing his correspondence with Rowsey: "Damn. Can you think of any others [appraisers]?"[219]

---

[216] Tr. 1476:8–10 (Koehn).

[217] *Id.* at 1474:19–22 (Koehn); *id.* at 1229:12–1230:5 (Van Kirk).

[218] JX 223.

[219] JX 227.

The Compatriot Parties also delayed in objecting to Flanagan's qualifications only until after receiving his appraisal. Van Kirk questioned Flanagan's qualifications when the parties exchanged the names of their respective appraisers on October 19, 2016. That same day, Platt responded: "We specifically asked Property Valuation Advisors about their experience in Pittsburgh and they 'work in [Pennsylvania] and eastern [Ohio] on a recurring basis and most major Midwestern cities.'"[220] Van Kirk never responded. Only after Van Kirk had time to compare Flanagan and Albert's appraisals, which were exchanged on November 23, did he object—on December 6. In his December 6 email to Borenstein, Van Kirk claimed that Flanagan's temporary practice permit to conduct appraisals in Pennsylvania was insufficient to qualify him as an appraiser under the Appraisal Schedule. Van Kirk explained that an appraiser "cannot have done more than 2 other appraisals in [Pennsylvania] in the last 12 months" to obtain a temporary permit, and thus, "at most, this is only the third [Pennsylvania] appraisal" Flanagan had conducted over the past year.[221] Van Kirk asserted that Flanagan's experience did not amount to "'specializing' in the Pittsburgh region."[222] The Appraisal Schedule does not contain a permitting requirement for a selected appraiser. Consequently, in the

---

[220] JX 237.

[221] JX 315.

[222] *Id.*

Summary Judgment Opinion, the court rejected the argument that Flanagan's temporary practice permit disqualified him as an eligible appraiser. *Morrow Park*, 2020 WL 3415649, at \*11. To be sure, nothing in the Appraisal Schedule's language suggests that an appraiser must have conducted more than three appraisals in the Pittsburgh region within the previous 12 months in order to have specialized in appraisals for that given region.

Weighing both the contemporaneous evidence and witness testimony, the court is convinced that the Compatriot Parties used their discretion to unreasonably object to Flanagan's qualifications as an appraiser. The Compatriot Parties had engaged Flanagan and his firm on 27 previous occasions and had attempted to do so again for an appraisal of the Apartments. They also expressed genuine disappointment when they learned that they would be unable to retain his services. Van Kirk inquired as to Flanagan's relevant experience early in the appraisal process and was given a prompt response by the Holtzman Parties. Only after having time to assess Flanagan's appraisal did Van Kirk object to his qualifications. Although Van Kirk did not know that the court would later reject his reasons for objecting to Flanagan, those reasons still appear contrived at the time they were given. If Van Kirk believed that the Appraisal Schedule required an appraiser specializing in the Pittsburgh region to perform a certain number of appraisals over a given period, he could have made that specific inquiry when initially confirming Flanagan's

69

qualifications on October 19, 2016. He did not. When Platt forwarded to Compatriot Flanagan's response about his experience on October 16, 2016, Compatriot never responded, thus evidencing its satisfaction with Flanagan's qualifications under the Appraisal Schedule. Flanagan was qualified to perform an appraisal of the Apartments under the Appraisal Schedule. The Compatriot Parties' objection to Flanagan's qualifications as an appraiser was spiteful retribution for the Holtzman Parties' having first procured his services before the Compatriot Parties contacted him and then submitting a *bona fide* appraisal that came in under the appraised value submitted by Compatriot's appraiser. The objection was the product of bad faith.

The Holtzman Parties, however, must also show that they suffered damages due to the Compatriot Parties' bad-faith objection to be successful on this implied covenant theory. The court addresses that issue in Part II.A.1.c below.

### c. Compatriot's Refusal to Close at $59 Million

The Holtzman Parties contend that Compatriot's refusal to allow VGRP to exercise the VGRP Purchase Right for $59 million breached the terms of the Appraisal Schedule. The Compatriot Parties counter that the Holtzman Parties have not proven that they were willing and able to close at $59 million on or before the VGRP Purchase Right deadline. According to the Compatriot Parties, that failure dooms the Holtzman Parties' breach of contract and implied covenant claims concerning the VGRP Purchase Right.

70

To exercise the VGRP Purchase Right, VGRP was required to remit the purchase price, as determined under the Appraisal Schedule, to CCI and Compatriot in exchange for their respective membership interests in MP Holding.[223] In a contract requiring simultaneous performance, "each party's performance is a 'concurrent condition' to the other party's performance." *Lewes Inv. Co. v. Est. of Graves*, 2013 WL 508486, at *12 (Del. Ch. Feb. 12, 2013) (citing Restatement (First) of Contracts § 251 (1932)), *aff'd*, 74 A.3d 654 (Del. 2013). Under a concurrent condition, "each party's duty to perform is conditioned on the other party's performance, or manifested, present ability to perform." *Id.* (citing Restatement (Second) of Contracts § 238 (1981)). To prove a breach of a concurrent condition, a plaintiff must demonstrate that "the agreed upon exchange would be carried out immediately" if its counterparty would have performed. *Id.* (quoting 15 Williston on Contracts § 47:5). Therefore, a plaintiff must first show that it could render performance to establish such a breach. *Id.*

VGRP initiated this action and moved for a temporary restraining order six days before the January 23, 2017 VGRP Purchase Right deadline. In its complaint,

---

[223] MP Holding Operating Agreement § 10.10(b). VGRP would also "be required to provide to [MP Holding] the amount of cash necessary" to trigger a series of transactions that would allow MP Holding to repurchase all outstanding shares of two classes of MP Holding stock held by Village Green Holding's employees and VG ECU. *Id.* § 10.10(a), (b); *see id.* § 3.4(b). Whether VGRP was capable of fulfilling this condition has not been raised by the parties.

VGRP contended that both of Albert's appraisals were invalid[224] and requested that the court order the parties "to close Plaintiff's purchase of Defendants' Interests in the [Apartments] at [*sic*] $54,600,000 valuation."[225] Alternatively, VGRP sought an order requiring the parties to close on a sale of the then-defendants' interests in the Apartments to VGRP for $59 million with $4.4 million (which VGRP referred to as the "disputed portion") to be held in escrow pending the court's resolution of the parties' claims.[226] VGRP was thus only willing to tender $54.6 million—the value of the Apartments according to its own appraiser—to close. The purchase price VGRP was willing to pay is below any purchase price at which the court or the parties could have conceivably arrived. The Holtzman Parties effectively concede as much as they no longer challenge the validity of the appraisal that Albert conducted for Compatriot. Indeed, the Holtzman Parties assert that "Holtzman was willing to accept both of [Albert's] appraisals . . . result[ing] in a $57.5 million valuation."[227] The Holtzman Parties' current position is consistent with their representations to Compatriot up until the filing of this action. At no time prior to

---

[224] Dkt. 1, Complaint ¶¶ 51–54.

[225] *Id.* at 22.

[226] Dkt. 1, Plaintiff's Motion for Temporary Restraining Order at 2; Dkt. 1, Compl. at 22.

[227] Holtzman Op. Br. 23.

this suit did VGRP question the validity of the first appraisal that Albert conducted for Compatriot.[228]

The three completed appraisals—Flanagan's for VGRP and Albert's for Compatriot and HFF, respectively—were all valid under the Appraisal Schedule as modified by the parties. The average valuation of those three appraisals is approximately $57.5 million. Before this litigation, VGRP never represented to Compatriot that it should pay less than $57.5 million. But on the eve of the VGRP Purchase Right deadline, VGRP's position was that it only needed to tender $54.6 million to purchase the Apartments. The Holtzman Parties have failed to show that VGRP was willing to render the requisite performance to exercise the VGRP Purchase Right. Therefore, the Holtzman Parties have not proven any breach of the MP Holding Operating Agreement.

It likewise follows that the Holtzman Parties cannot prove that they suffered damages due to Compatriot's bad-faith rejection of Flanagan's appraisal. To satisfy the damages element of a breach of contract claim, "the plaintiff must show both the existence of damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract." *Base Optics Inc. v. Liu*, 2015

---

[228] *See* JX 315 (Borenstein's email to Van Kirk presenting two options for the parties to "achieve a prompt and fair resolution": "Either (i) immediately instruct the appraisers [to] appoint a third [appraiser], and average the 3 [appraisals] (i.e. $54.6M, $59M and the 3rd); or (ii) $57.5M.").

WL 3491495, at *16 (Del. Ch. May 29, 2015) (internal quotations omitted). This same standard must be met for a claim under the implied covenant as well. *See NAMA Hldgs.*, 2014 WL 6436647, at *16; *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998). In assessing damages, the court considers "how the positions of the parties would differ in the 'but-for' world—*i.e.*, the hypothetical world that would exist if the Agreement had been fully performed." *eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *43 (Del. Ch. Sept. 30, 2013).

The Holtzman Parties would be no differently situated today but for Compatriot's bad-faith objection to Flanagan's appraisal. Indeed, the parties' dispute over the validity of the Mortgage Appraisal is equally pertinent. VGRP initiated this litigation alleging that the Mortgage Appraisal was invalid, basing the purchase price in its requested relief on that assumption. The Compatriot Parties' meritless challenge to the validity of the Mortgage Appraisal under the modified Appraisal Schedule was just as fatal to the negotiations leading up to this litigation. VGRP's intervening actions preempted any contractual violation that may have resulted from Compatriot's actions alone. Consequently, the Holtzman Parties cannot show that any damages that it suffered were caused by Compatriot. The Holtzman Parties' breach of contract theory fails on this basis as well.[229]

---

[229] The Holtzman Parties devote an entire subsection of their briefing to the contention that "Holtzman Was Ready, Willing, and Able to Close." Holtzman Op. Br. 38. The entirety of their argument, however, is only devoted to proving that Holtzman "could easily have

74

### 2. Was Compatriot Required to Approve the Permanent Mortgage?

The parties also disagree as to whether the Compatriot Parties were required to approve the Permanent Mortgage. The Holtzman Parties assert that the Compatriot Parties were obligated to approve the Permanent Mortgage under the terms of the MP Managing Operating Agreement. The Holtzman Parties contend that the Compatriot Parties' refusal to do so breached the MP Managing Operating Agreement or, alternatively, the implied covenant of good faith and fair dealing. The Compatriot Parties contend that no such obligation existed either expressly or impliedly and, in any event, the Holtzman Parties lack standing to bring these claims.

As to their standing argument, the Compatriot Parties assert that none of the Holtzman Parties was a signatory to the MP Managing Operating Agreement.[230] The Compatriot Parties also contend that none of the Holtzman Parties was an intended third-party beneficiary to the agreement. The Holtzman Parties counter that the

---

generated" the requisite cash to exercise the VGRP Purchase Right and fails to show that Holtzman and VGRP were *willing* to close at a purchase price of at least approximately $57.5 million, took any affirmative steps to do so, and made those intentions clear to Compatriot. *Id.*; *see also id.* at 38–44. The Holtzman Parties have not shown that "the agreed upon exchange would be carried out immediately," but for an impediment attributable to Compatriot. *See Lewes*, 2013 WL 508486, at *12; Restatement (Second) of Contracts § 238 cmt. a (1981) ("Where the performances are to be exchanged simultaneously under an exchange of promises, each party is entitled to refuse to proceed with that simultaneous exchange until he is reasonably assured that the other party will perform at the same time.").

[230] Compatriot Op. Br. 39; MP Managing Operating Agreement at -3527, -3562–63.

parties to the MP Managing Operating Agreement intended for Holtzman to be a third-party beneficiary to that agreement.

"An incidental beneficiary to a contract generally does *not* have standing under Delaware law to enforce the terms of an agreement to which it is not a party." *Lechliter v. Del. Dep't of Nat. Res. Div. of Parks & Recreation*, 2015 WL 7720277, at *4 (Del. Ch. Nov. 30, 2015) (emphasis in original). On the other hand, "intended third-party beneficiaries have an enforceable right under contracts conferring a benefit to them, even though they are not parties to those contracts." *Comrie v. Enterasys Networks, Inc.*, 2004 WL 293337, at *2 (Del. Ch. Feb. 17, 2004).

> To qualify as a third party beneficiary of a contract, (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract.

*Madison Realty P'rs 7, LLC v. Ag ISA, LLC*, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001).

The Holtzman Parties contend that the second amendment to the MP Managing Operating Agreement (the "Second Amendment") conferred third-party beneficiary status to Holtzman under the original agreement. The Second Amendment replaced Village Green Holding with MP Holding as one of MP

76

Managing's two members, the other being Compatriot.[231]  The Holtzman Parties generally point to Paragraph five of the Second Amendment, which they argue is the basis for Holtzman's third-party beneficiary status.  Paragraph five reads:

> This Amendment is binding on and shall inure to the benefit of [MP Managing], the Members and the Manger [sic] and their respective heirs, legal representatives, successors and permitted assigns and all other Persons hereafter holding, having or receiving an interest in [MP Managing], whether as transferees, Substitute Members or otherwise. The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person.[232]

Holtzman believed the Second Amendment personally granted him rights under the MP Managing Operating Agreement.[233]  Although the Second Amendment is the only colorable basis upon which Holtzman can assert standing for this claim, the Holtzman Parties only address it in their post-trial answering brief.[234]  The Holtzman Parties do not explain what language in Paragraph five confers third-party beneficiary status on Holtzman.  Nor do they reconcile their argument with the last clause of Paragraph five, which explicitly limits third-party beneficiaries to those expressly enumerated in that paragraph.

---

[231] JX 133.

[232] *Id.* ¶ 5.

[233] Tr. 249:5–250:8 (Holtzman).

[234] *See* Holtzman Ans. Br. 25–26.

77

Neither Holtzman nor any of the other Holtzman Parties was an "heir[], legal representative[], successor[]," or "permitted assign[ee]" of MP Managing's members—MP Holding and Compatriot—or its manager—MP Holding. Similarly, none of the Holtzman Parties can point to an interest it directly had in MP Managing. This alone demonstrates that none of the Holtzman Parties was an intended third-party beneficiary of MP Managing.

As a fallback, and with no further analysis or explanation, the Holtzman Parties cite *In re Delaware Public Schools Litigation*, 239 A.3d 451, 510 (Del. Ch. 2020), for the general proposition that "standing is a broad and flexible concept under Delaware law."[235] In that case, the NAACP Delaware State Conference of Branches, the Delawareans for Educational Opportunity, and the City of Wilmington brought claims against all three Delaware counties, alleging that the counties' failure to properly update property valuations was in violation of both the Delaware Constitution and the Delaware Code. The plaintiffs argued, and proved at trial, that the counties' valuation methodology led to an improper reduction in the amount of property taxes owed, which in turn diminished the funds available for Delaware's public schools and unfairly shifted the property tax burden onto some Delaware

---

[235] *Id.* at 25.

residents over others. As its "principal defense," the counties argued that the plaintiffs lacked standing to sue. *Id.* at 509.

The court, however, disagreed, ruling that the plaintiffs had standing to bring their claims. In a thorough and thoughtful analysis, the court compared the standing doctrines in state and federal court, explaining that "state court standing doctrine is appropriately more flexible than federal standing doctrine, because the state courts play a different and more expansive role than the federal courts." *Id.* at 510. In applying the State's broader standing doctrine, the court utilized various principles of standing that have either been abrogated, significantly diminished, or never recognized in the federal courts. *Id.* at 517–18 (comparing the broader zone-of-interests test in state court to that in federal court), 526–27 (recognizing a broader associational standing doctrine in Delaware), 538–40 (public policy-based standing).

Here, the Holtzman Parties do not identify any area of Delaware's more flexible standing doctrine that would be applicable in their case. Nor do they assert that this is an appropriate case for the court to exercise its equity jurisdiction and use its "expansive power, to meet new exigencies and to meet changing needs." *See id.* at 511 (quoting *Schoon v. Smith*, 953 A.2d 196, 205 n.24, 206 (Del. 2008)) (internal quotations omitted). Indeed, this is a rather unremarkable and overly litigated contract dispute that is devoid of any novel or pressing public policy concerns. To

recognize the Holtzman Parties' standing in this instance would promote an inconsistent and inappropriate expansion of this court's standing doctrine and ignore the parties' heavily negotiated contracts. The court declines to do so.

**B.    The Alleged Mismanagement of the Holtzman-Controlled Properties**

As noted earlier in this Opinion, the Redemption Agreement contemplated a series of transactions among the parties that would effectuate their separation through the shifting of their respective membership interests in various joint projects. Prior to the Redemption Agreement's execution, Holtzman had been the Chairman and CEO of Village Green Management, the property management entity for many of the parties' properties.[236] Both the Redemption and Closing Agreements provided that, following Holtzman's departure, Village Green Management would continue to honor all existing property management agreements with any Holtzman-Controlled Properties and continue to serve as the property manager for those properties for at least 180 days.[237]

The Holtzman Parties argue that the Compatriot Parties breached three obligations under either the Redemption or Closing Agreements pertaining to the management of the Holtzman-Controlled Properties. First, the Holtzman Parties

---

[236] Tr. 46:19–47:11 (Holtzman).

[237] Redemption Agreement § 1.3(a); Closing Agreement ¶ 2.

assert that the Compatriot Parties failed to adhere to budgets outlined in management agreements for Holtzman-Controlled Properties and managed by Village Green Management. Second, the Holtzman Parties contend that Village Green Holding breached the Closing Agreement by treating Holtzman-Controlled Properties differently than other third-party clients. Third, the Holtzman Parties allege that the Compatriot Parties failed to maintain staffing continuity at Holtzman-Controlled Properties in violation of the Redemption Agreement.

### 1. Budget Adherence

The Holtzman Parties contend that Village Green Management exceeded budgets that were agreed upon for Holtzman-Controlled Properties. Specifically, the Holtzman Parties point to the expenses for 20 Holtzman-Controlled Properties that exceeded those that were either budgeted or approved ("Budget Variances"). Budget Variances were documented in an expense approval form tracker (the "EAF Tracker").[238] Michael Schilling, who worked in the property management arm of Village Green Holding maintained the EAF Tracker.[239] According to Schilling, Village Green Management would submit an internal expense approval form to the owners of a property, if its upcoming management expenses would result in a Budget

---

[238] *See* JX 821, Ex. B-1 (chart detailing expenses that exceeded those budgeted); Tr. 888:20–889:17 (Schilling) ("EAF is expense approval form. It's an internal form that Village Green used to request above-budget expenses from ownership groups.").

[239] Tr. 889:15–17 (Schilling).

Variance.[240]  If an expense approval form was approved, Schilling would log those Budget Variances in the EAF Tracker.[241]  Additionally, along with each Budget Variance, Schilling would record the date of approval, a description of what was approved, and a specific account code relating back to line items in the budget and financial statements.[242]  According to the Holtzman Parties, these Budget Variances violated the Closing Agreement, which reads:  "No services will be performed and no fees will be incurred or charged other than as pursuant to written agreements and fee schedules attached thereto (and/or schedules as may be mutually agreed upon) and pursuant to written authorizations and procedures as set forth in the management agreements."[243]

The Compatriot Parties counter that the Holtzman Parties lack standing to bring this claim directly against any of the Compatriot Parties.[244]  The properties that incurred the Budget Variances are owned by entities that are not parties to this action. None of the Holtzman Parties are parties to any of the operating agreements for the LLCs controlling the properties where they allege Budget Variances occurred.[245]

---

[240] *Id.* at 889:12–14 (Schilling).

[241] *Id.* at 889:21–890:6 (Schilling).

[242] *Id.* (Schilling); *see also* JX 608 (EAF Tracker).

[243] Closing Agreement ¶ 2; *see* Holtzman Op. Br. 49–51.

[244] *See* Dkt. 250 ¶¶ 221–26 (bringing direct claim for breach of the Closing Agreement).

[245] Tr. 1039:16–22 (Frazee); *e.g.*, JX 23 (operating agreement for Ann Arbor City Apartments LLC); JX 51 (operating agreement for Gold Coast City Apartments LLC).

Instead, the Holtzman Parties control entities—not named in this action—that are members of those LLCs.

The question of direct versus derivative standing turns on two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004). The court may utilize caselaw governing the distinction between direct and derivative corporate suits when assessing that distinction in the analogous context of an LLC. *Kelly v. Blum*, 2010 WL 629850, at *9 (Del. Ch. Feb. 24, 2010).

The Compatriot Parties contend that even assuming *arguendo* that Village Green Management did cause the Budget Variances, any resultant harm would have first flowed to the respective LLCs where the Budget Variances occurred, and only indirectly to the members of those LLCs. Consequently, it would be the LLCs that would first receive any recovery following a successful action against Village Green Management, not the members. The Holtzman Parties' expert's report confirms that the Holtzman Parties' claim is derivative. It shows a "Grand Total" of $1,831,122 in Budget Variances, but only $336,114 flowing to the "Holtzman Interests."[246]

---

[246] JX 821, Ex. B-1; *see* Tr. 1042:15–16 (Frazee) ("Line 24 on [Exhibit] B-1 reflects the damages for the Holtzman interests.").

"[C]laims of mismanagement resulting in a decrease in the value of corporate stock are derivative in nature." *Feldman v. Cutaia*, 951 A.2d 727, 734–35 (Del. 2008); *see also Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) ("actions charging mismanagement which depress the value of stock allege a wrong to the corporation; *i.e.*, the stockholders collectively, to be enforced by a derivative action" (internal quotations and alterations omitted)). The Holtzman Parties' allegations of mismanagement of the 20 LLCs would similarly lead to a "direct wrong to the [LLC] that is indirectly experienced by all [members]." *Kramer*, 546 A.2d at 353 (internal quotations omitted).

The Holtzman Parties counter that they have standing to sue directly under the Closing Agreement.[247] Under their theory, the Closing Agreement was a promise made by the Compatriot Parties directly to the Holtzman Parties to comply with preexisting obligations under the operating agreements of the 20 LLCs. The Holtzman Parties contend that their claim for breach of the Closing Agreement is a direct claim, even if they could bring identical derivative claims under the operating agreements for the 20 LLCs that had Budget Variances.

This argument, however, ignores the nature of the claim. The Closing Agreement does not alter the relationship between the Holtzman Parties and the

[247] Holtzman Ans. Br. 42–45.

Compatriot Parties regarding a claim for mismanagement of the 20 LLCs. Indeed, the Holtzman Parties argue that the Closing Agreement was an "affirmation" of the Compatriot Parties' preexisting obligations.[248] Whether any alleged mismanagement of the 20 LLCs occurred before or after the Closing Agreement's execution would not change who suffered any harm or who would be entitled to damages following a successful claim. Based on the Holtzman Parties' reasoning, parties may contractually manufacture direct claims where only derivative standing previously existed. The Holtzman Parties do not cite any authority for this proposition, and the court declines to accept it here. Because this claim is derivative and the Holtzman Parties do not contend that they have met the pleading standards for a derivative claim, *see* 6 *Del. C.* § 18-1003, the Holtzman Parties have not met their burden.[249]

### 2. The Treatment of Holtzman-Controlled Properties

The Holtzman Parties also assert that Village Green Management managed Holtzman-Controlled Properties differently than the other properties under its

---

[248] *Id.* at 43–44.

[249] The Holtzman Parties again argue that "standing is broad and flexibly applied," citing *In re Delaware Public Schools Litigation*, 239 A.3d 451, 510 (Del. Ch. 2020). Holtzman Ans. Br. 42. As stated above, the Holtzman Parties do not explain why the court should adopt a more "flexible" approach to standing in this case, and they cite no authority where the court has adopted a more flexible standing doctrine under similar circumstances. *See supra* II.A.2. The court will not labor to construct an argument for the Holtzman Parties here.

management, in violation of the Closing Agreement. The relevant provision in the Closing Agreement reads: "[Village Green Holding] company subsidiaries personnel will treat [Holtzman] and his controlled entities in the same manner as [Village Green Holding] company subsidiaries treat all other third party clients."[250] The Holtzman Parties argue that Village Green Management violated its own internal policies and procedures manual (the "Manual") when managing the Holtzman-Controlled Properties, pointing to two particular sections of the Manual.[251] First, they contend that the Manual mandates that Village Green Management employees adhere to budgets in the management agreements that the company signs with the property owners.[252] The Holtzman Parties argue that the Budget Variances violated this provision of the Manual. Second, they direct the court to another section of the Manual that states: "Village Green managed communities are among the most beautifully landscaped and well-maintained communities anywhere. . . . Any deficiency that affects curb appeal must be corrected immediately."[253] The Holtzman Parties present evidence of neglect and the accumulation of piles of trash at a Holtzman-Controlled Property under the

---

[250] Closing Agreement ¶ 2.

[251] *See* JX 842.

[252] Holtzman Op. Br. 51–52; *see* JX 842 at 150–53.

[253] JX 842 at 208; *see* Holtzman Op. Br. 52.

supervision of Village Green Management.[254]  Additionally, Diane Batayeh, CEO of Village Green Holding, testified that, following the execution of the Closing Agreement, she could not recall any non-Holtzman-Controlled Properties for which Village Green Management violated its Manual while it managed Holtzman-Controlled Properties.[255]

As an initial matter, the Holtzman Parties have failed to show how they have standing to directly assert this claim.[256]  Assuming *arguendo* that Holtzman-Controlled Properties were treated differently than non-Holtzman-Controlled Properties, the Holtzman Parties have failed to show how damages emanating from this form of a breach of the Closing Agreement would be distinct from those flowing from alleged mismanagement.  And in their damages calculation, the Holtzman Parties do not distinguish between the damages flowing from these two claims as well.[257]  All of the Holtzman-Controlled Properties at issue are not directly owned by the Holtzman Parties.  Here, the Holtzman Parties contend that Village Green

---

[254] JX 589; Tr. 876:13–877:5 (Schilling) ("Village Green didn't maintain the trash chute. Trash piled up.  And rather than dispose of it, they filled mechanical rooms, you know, to chest height with trash that, subsequently, [CCA] had to take charge of disposing of and pay a vendor, I think, almost $10,000 to take care of, because they were ignoring problems.").

[255] Tr. 1456:24–1457:4 (Batayeh).

[256] *See* Dkt. 250 ¶¶ 221–26 (bringing direct claim for breach of the Closing Agreement).

[257] *See* Holtzman Op. Br. 54–64.

Management failed to manage the Holtzman-Controlled Properties akin to how it managed other properties under its supervision and in accordance with the Manual, *i.e.*, mismanagement. The alleged harms would have thus been inflicted upon the entities that directly own the Holtzman-Controlled Properties, and any awarded damages would first flow to those entities as with the Budget Variances claim.[258] The Holtzman Parties lack standing to assert this claim.

The Holtzman Parties have also failed to prove this claim by a preponderance of the evidence. The evidence confirms instances in which Village Green Management may not have complied with the Manual in its management of at least some Holtzman-Controlled Properties, but there is scant support for the proposition that the Holtzman-Controlled Properties were treated differently. Indeed, the only evidence that the Holtzman Parties cite for this proposition is Batayeh's testimony, which was a short answer in the negative to the question: "Can you tell the Court about any non-Holtzman clients as to which Village Green violated any of the policies we've discussed [from the Manual] from June 2016 through 2018."[259] The Holtzman Parties do not provide any other evidence showing how Village Green Management managed non-Holtzman-Controlled Properties. Recognizing the shaky footing on which their argument stands, the Holtzman Parties assert that this

---

[258] *See* II.B.1 *supra*.

[259] Tr. 1456:24–1457:4 (Batayeh).

single line of testimony "raises a strong inference that [the Compatriot Parties] treated Holtzman differently than they did other clients."[260] After over five years of litigation and extensive discovery, the Holtzman Parties are expected to prove this claim by a preponderance of the evidence. Batayeh's testimony alone is insufficient to prove that Village Green Management managed non-Holtzman-Controlled Properties differently than how the Holtzman-Controlled Properties were managed.[261]

### 3. Staffing Continuity

The Redemption Agreement obligated Village Green Holding to staff the Holtzman-Controlled Properties that its subsidiaries managed with "substantially the same . . . personnel" following the date that the Closing Agreement became effective.[262] The Holtzman Parties allege that Village Green Management "pervasively failed to maintain staffing continuity as promised, diverting staff to [non-Holtzman-Controlled Properties] or employing inexperienced employees" in

---

[260] Holtzman Op. Br. 52.

[261] The Holtzman Parties also argue that Village Green Management specifically mismanaged the Central West End City Apartments, a Holtzman-Controlled Property. Holtzman Op. Br. 53–54. But that argument fails for the same reasons as their general claim regarding mismanagement of the other Holtzman-Controlled Properties. The Holtzman Parties have improperly alleged a direct instead of a derivative claim. Additionally, the Holtzman Parties do not develop a theory of liability for this claim. Assuming the theory of liability is identical to the general mismanagement claim above, the Holtzman Parties have similarly failed to meet their burden.

[262] Redemption Agreement § 1.3(a); *see id.* § 2.1; Closing Agreement ¶ 1.

violation of the Redemption Agreement.[263] The Holtzman Parties point to testimony given by Michael Schilling, who worked in the property management arm of Village Green Holding, where he described how the level of staffing and oversight at Holtzman-Controlled Properties "substantially changed" after June 2016.[264] Specifically, Schilling recounted how various properties were understaffed compared to the level of budgeted staffing; "were missing staff for periods of time, sometimes extended periods of time"; and had been allocated "untrained or underqualified staff" in exchange for staff that had been "trained and tenured."[265] According to Schilling, "[p]rior to the transition of ownership, the properties were staffed to budget. If there ever was a staff turnover, it was immediately filled."[266] The Holtzman Parties also cite correspondence between themselves and representatives from the Compatriot Parties documenting instances where the Holtzman Parties complain that Village Green Management had failed to adequately staff Holtzman-Controlled Properties with property managers and other staff that had previously helped manage the properties.[267] The Holtzman Parties contend that

---

[263] Holtzman Op. Br. 52.

[264] Tr. 864:8–17 (Schilling).

[265] *Id.* at 865:1–11 (Schilling); *see also id.* at 865:22–866:5 (Schilling) (providing additional examples).

[266] *Id.* at 867:11–13 (Schilling).

[267] JX 513; JX 526; JX 623.

90

the insufficient staffing was detrimental to both the properties' financial performance and resident satisfaction.[268]

These allegations similarly fail to demonstrate that the Holtzman Parties have standing like the other mismanagement claims above.[269] If a lack of adequate staffing did in fact lead to any damages, those damages would have been incurred by the properties themselves and flow to their respective LLC owners, none of which are named in this action. Thus, like the other mismanagement claims, this claim is derivative, but has been incorrectly brought as a direct claim.

The Holtzman Parties have also unsuccessfully connected inadequate staffing with any Holtzman-Controlled Property's underperformance. The Holtzman Parties point to three pieces of evidence, which, even when considered together, fail to meet the preponderance of the evidence standard. First, they point to a September 8, 2017 email from Jonathan Sherman, an Assistant Director at CCA, to Bob Gleason of Village Green Holding.[270] In that email, Sherman complains about the performance of one Holtzman-Controlled Property, Mill District City Apartments. Specifically, he attributes the property's lackluster income and net operating income to its below-target occupancy. Additionally, he states that the low level of occupancy "has

---

[268] Holtzman Op. Br. 52–53.

[269] *See supra* II.B.1 & II.B.2.

[270] *See* JX 593.

hindered the partnerships [*sic*] ability to refinance the mortgage."[271]  Sherman expresses that the property is "in serious need of both a marketing and facilities presence" considering that "competitors continue to outpace us with higher rents and occupancies" despite the property's rents being "less than new product and [its] location superior."[272]  Sherman notes, however, that "Village Green has been unable to supply the property with a consistent Marketing Director or Regional Facilities Director."[273]  In this email, Sherman indicates that adequate staffing would likely help remedy the property's poor occupancy and performance.

The Sherman email is hearsay.  Although the Compatriot Parties did not press this objection in their post-trial briefs, the email lacks persuasive force.  The Holtzman Parties do not offer the primary sources or data that is the basis of the arguments being made in Sherman's email.  At best, the email only purports to describe the effects that inadequate staffing had on *one* Holtzman-Controlled Property.  The Holtzman Parties do not point to any persuasive evidence that would support their argument across any of the other Holtzman-Controlled Properties.

Second, in their opening brief, the Holtzman Parties cite to a 53-page resident satisfaction survey from 2016 for the proposition that inadequate staffing led to a

---

[271] *Id.*

[272] *Id.*

[273] *Id.*

decrease in resident satisfaction without any further elaboration.[274] While a summary of the survey's results across all properties shows that three resident satisfaction metrics had fallen year-over-year, all three metrics were still considered to be within the highest level of performance, labeled "outstanding."[275] The firm conducting the survey speaks highly of those property managers and owners who achieve such a rating: "The management team should be commended for providing excellence in service, while the Building Owner is to be applauded for providing the resources necessary to keep the property in outstanding condition and market-competitive."[276] Given the dearth of corroborating evidence and the overall continued strong resident satisfaction that the survey demonstrates, the court remains unconvinced that the survey proves that the Compatriot Parties breached the Redemption Agreement. In their answering brief, the Holtzman Parties tacitly acknowledge that a decline in resident satisfaction "does not establish a breach," but contend that it nevertheless is "further evidence of a breach" and constitutes "circumstantial evidence of a decline in services."[277] But the Holtzman Parties have produced virtually no other admissible evidence.

---

[274] Holtzman Op. Br. 53; *see* JX 902.

[275] JX 902 at -6154.

[276] *Id.* at -6201.

[277] Holtzman Ans. Br. 48.

Third, the Holtzman Parties cite to Holtzman's answer to a question during trial, asking if there was "an impact on the performance" of Holtzman-Controlled Properties due to their management following the execution of the Redemption Agreement.[278] Holtzman responded that there was a "downward trend" in customer satisfaction surveys, cash flow, and expenses, although "the economy was very strong at that time."[279] This self-serving testimony is insufficient, even when assessed in tandem with the satisfaction survey, to prove that a lack of staffing continuity caused this "downward trend." This testimony also fails to specify that the alleged property mismanagement was caused in part by a lack of staffing continuity.

## C. Accrual of the Preferred Returns

The parties dispute the accrual of the Preferred Returns. The Holtzman Parties contend that the Preferred Returns' accrual should have ended in January 2017 for the Compatriot Parties.[280] Referring the court to the arguments in its pretrial brief,[281] the Holtzman Parties argue that the Compatriot Parties should not be allowed to benefit from their "misconduct" that allowed the Preferred Returns to continue to

---

[278] Tr. 65:3–5 (Holtzman).

[279] *Id.* at 65:8–12 (Holtzman).

[280] Holtzman Op. Br. 37, 56 n.11.

[281] *Id.* at 36–37.

accrue past January 2017.[282]   According to the Holtzman Parties, but for this "misconduct," a sale of the Apartments would have been consummated in January 2017 and the Preferred Returns would have stopped accruing.  Therefore, the Holtzman Parties assert that the Preferred Returns should stop accruing to the extent they would only benefit the Compatriot Parties, while the remainder of the Preferred Returns may continue to accrue.  The Compatriot Parties counter that the Preferred Returns never stopped accruing.  They assert that the Preferred Returns only cease accruing if either MP Managing and MP Holding are dissolved or their respective assets are distributed.[283]

These two agreements provide little guidance regarding the timing of a distribution of the Apartments' sale proceeds which generate the Preferred Returns. The MP Managing Operating Agreement states that "Net proceeds from Capital Transactions shall be distributed as soon as possible following the Capital Transaction in question."[284]  There is no analogous provision, however, in the MP Holding Operating Agreement.[285]  The agreements do not otherwise explicitly state when their respective Preferred Return ceases to accrue.  Indeed, the only means by

---

[282] Dkt. 609 at 48.

[283] Compatriot Op. Br. 70.

[284] MP Managing Operating Agreement, amend. I § 5.2.

[285] *See* MP Holding Operating Agreement § 4.3(d) (Distribution Priority Protocols for Net Proceeds From MP Apartments and/or Morrow Park LLC Capital Transactions).

which an accrual of the Preferred Returns could be halted is as the Compatriot Parties contend—through a distribution of the underlying funds or dissolution of the entities themselves. As of today, neither event has occurred, and accordingly, the Preferred Returns continue to accrue.

The Holtzman Parties argue that if the court holds that the Preferred Returns continue to accrue past January 2017, the Compatriot Parties will be allowed to benefit from their "misconduct" and breach of the agreements. The Holtzman Parties, however, have failed to prove their claims for a breach of contract or the implied covenant. In fact, after over five years of litigation, the Holtzman Parties failed to demonstrate that they had standing to bring their claims under the MP Managing Operating Agreement altogether.[286] The Compatriot Parties raised this issue during the summary judgment stage of these proceedings.[287] Without any further support, the Holtzman Parties responded that "the close interrelationship of the different entities established Holtzman as a third-party beneficiary."[288] The dearth of the parties' briefing on this issue forced the court to defer on the Holtzman Parties' standing in the Summary Judgment Opinion. *Morrow Park*, 2020 WL 3415649, at *21–22. The Compatriot Parties raised this issue again during pre-trial

---

[286] *See supra* II.A.2.

[287] Dkt. 328 at 56–57.

[288] Dkt. 344 at 59.

briefing.[289]   Although the pre-trial briefs were exchanged on the same day, the Holtzman Parties did not address their standing, despite the court's indication that it planned to revisit the issue post-trial.  And following the trial, even though the court had made clear that the parties should more fully address the standing issue, the Holtzman Parties only cursorily addressed standing in their answering brief, largely relying on Holtzman's self-serving testimony and rehashing the same unsupported assertion in their pre-trial brief:  that "the close interrelationship of the different entities establishes Holtzman as a third-party beneficiary."[290]  Rather than affording this deficiency the attention it deserved, the Holtzman Parties devoted their time to drafting a 65-page opening brief that provides the court with little guidance as to what claims remain and why they are entitled to their requested relief.[291]

The Holtzman Parties' strategic maneuvering outside of this jurisdiction has also influenced this outcome.  LAV filed the Pennsylvania Action only after

---

[289] *See* Dkt. 608 at 53.

[290] Holtzman Ans. Br. 26.

[291] Indeed, despite this case's complexity, the litany of issues to be resolved, and the overall length of their brief, the Holtzman Parties cite only eight cases from this jurisdiction—none of which were decided in the past decade—in their opening brief.  Holtzman Op. Br. iii.  And during post-trial argument, when discussing their claim for breach of the MP Managing Operating Agreement, the Holtzman Parties continued to dodge the issue of standing.  Hrg. 35:16–24 ("Compatriot has argued that that wasn't a breach because Holtzman lacked standing to bring the claim.  First of all, even if it's not an independent breach, it does show, again, pressure.  It does show, again, a continuation of the bare-knuckle business dispute on the part of Compatriot.  THE COURT:  Mr. Kaye, there is no claim for bare-knuckle pressure.  ATTORNEY KAYE:  No.").

Holtzman encouraged it to do so along with agreeing to pay its attorneys' fees and expenses.[292] The Pennsylvania Action precipitated the sale of the Apartments even though the Status Quo Order—which was limited to the transfer of interests in the entities that owned the Apartments, not the Apartments themselves—remained in effect. Initially, the Pennsylvania litigation gambit presented the Holtzman Parties with the opportunity they had sought from the beginning—to purchase the Apartments outright. They prevailed in the bidding process and executed an agreement to purchase the Apartments for $58.75 million. But the Holtzman Parties did not live up to the terms of the agreement, leading the Special Master to conclude that they could not provide "any assurances or evidence" that they "possesse[d] the equity or ha[d] obtained the financing sufficient to close the transaction."[293] The Pennsylvania Court agreed. It was only then that CCI was able to step in and purchase the Apartments once the Holtzman Parties failed to demonstrate that they had the necessary funds (as in January 2017[294]) and meet various other closing conditions.

The Holtzman Parties complain that the Compatriot Parties were improvidently granted ownership of the Apartments while simultaneously

---

[292] Tr. 115:16–116:13 (Holtzman).

[293] JX 747 ¶ 36, 37.

[294] *See supra* II.A.1.c.

benefitting from the Preferred Returns' continued accrual. These conditions would not exist, however, *but for* the Holtzman Parties' actions. Unsatisfied with the proceedings in this forum, the Holtzman Parties attempted to circumvent the Status Quo Order by encouraging parallel litigation in the Pennsylvania Court. That attempt, though, ultimately failed, and they came away in a more precarious position than before. Now the Holtzman Parties return to this court invoking equity to avoid their contractual commitments. The agreements at issue were heavily negotiated between sophisticated parties. Delaware law, which the parties chose to govern their agreements, "is more contractarian than that of many other states" and "parties' contractual choices are respected." *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *12 (Del. Ch. July 11, 2011). "The value of contracts is based on certainty and enforceability. The promiscuous employment of equity to amend contracts to make them 'fair' or 'reasonable' would be fatal to those qualities." *RoundPoint Mortg. Servicing Corp. v. Freedom Mortg. Corp.*, 2020 WL 4199957, at *7 (Del. Ch. July 22, 2020). This court need not twist itself in knots to avoid a purported inequitable result when a party fails to prove a breach of an agreement as the Holtzman Parties were unsuccessful in doing here. In this case, neither party can claim ownership over the moral high ground.

The Compatriot Parties have submitted a spreadsheet, reflecting their proposed flow of funds of the sale proceeds from the sale of the Apartments based

99

on the relevant agreements (the "Compatriot Waterfall").[295] The Holtzman Parties rely on the Compatriot Waterfall and do not dispute its accuracy apart from its calculation of the Preferred Returns, which the court has now resolved.[296] The parties are accordingly directed to confer over whether any further modification of the Compatriot Waterfall is necessary in light of the court's ruling above and submit a form of order for the distribution of the Apartments' sale proceeds that remain with the Register in Chancery.

## III. CONCLUSION

The parties in this case began with a thoughtful series of heavily negotiated agreements detailing the process governing their complicated business divorce. But impatience with the processes detailed in those agreements coupled with mutual animus quickly derailed that careful planning. For the reasons stated herein, the court leaves the parties as they are and directs them to confer and submit a form of final order consistent with this Opinion, including the details as specified at the conclusion of II.C above.

---

[295] *See* JX 873.

[296] Holtzman Op. Br. 55 ("There is not a substantive disagreement over the waterfall formulae.") (citing Tr. 513:10–13 (Platt) as reflecting the substantive disagreement between the parties regarding the Compatriot Waterfall ("Q. But you understand that there's a dispute in this matter about when that preferred return should have stopped accruing? A. That's correct, yes.")); Holtzman Ans. Br. 38 ("there was no substantive disagreement between the parties about the waterfall models").